UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WESLEY GEER,

                              Plaintiff,

                    v.

GATES CHILI CENTRAL SCHOOL DISTRICT,
et al.,

                              Defendants.
_____

<u>DECISION AND ORDER</u>

17-CV-6161L

        Plaintiff Wesley Geer filed this action in March 2017, alleging that he was terminated from his employment as a high school teacher with the Gates-Chili Central School District ("District") in 2017, in violation of his federal civil rights and tortiously under New York law.

        Three motions are now pending before the Court: a motion by defendants Joseph DiMaria and Employee Health Referral Systems, Inc., d/b/a Employee Health Systems ("EHS") to dismiss the complaint (Dkt. #24); a motion by plaintiff for leave to file a second amended complaint (Dkt. #37); and a motion by plaintiff to compel production of certain discovery-related documents (Dkt. #45).

## BACKGROUND

        Unless otherwise indicated, the facts are taken from the amended complaint (Dkt. #8), the allegations of which are assumed to be true, for purposes of the motion to dismiss. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court has also considered certain

documents that are referred to or incorporated by reference in the complaint. *See Whipple v. Reed Eye Associates*, 213 F.Supp.3d 492, 495 (W.D.N.Y. 2016).

Plaintiff, who was born in 1959, was a tenured middle-school social studies teacher with the Gates-Chili Central School District ("District") from 1999 until his termination on April 7, 2016. He was terminated as a result of certain charges brought against him, which resulted in a arbitrator's finding that plaintiff was guilty of "conduct unbecoming a teacher, immoral character, insubordination and neglect of duty." Amended Complaint ¶ 23 (referencing arbitrator's decision); Arbitrator's Decision (Dkt. #32-4) at 3. This mostly related to plaintiff's interactions with students, particularly on several occasions when he lost his temper and shouted at students.[1]

Around 2009, plaintiff, who alleges that he has suffered from post-traumatic stress disorder for many years, sought psychological treatment for problems stemming from several causes, including his wife's illness and other traumatic events. Complaint ¶¶ 52-54. During the 2011-12 academic year, plaintiff also participated in therapy, pursuant to the District's employee assistance program ("EAP"). He alleges that he did so at the direction of the District. Complaint ¶ 106. Plaintiff does not appear to take issue with that directive, as he alleges that his participation in the EAP was a reasonable accommodation for his emotional or psychological difficulties. Complaint ¶ 104.

---

[1]The arbitrator's decision is referenced in the complaint, and the arbitration proceeding is central to plaintiff's claims here. Plaintiff has submitted a copy of the decision, and defendants do not challenge its authenticity. The Court may therefore consider it on a motion to dismiss. *See Campanella v. County of Monroe*, 853 F.Supp.2d 364, 370 n. 2 (W.D.N.Y. 2012) (since arbitration proceeding was referenced in the complaint, arbitration decision that was issued after the complaint was filed could fairly be considered by the Court on Rule 12(c) motion, as integral to the plaintiffs' claim).

The EAP was administered by defendant EHS, pursuant to a contract between EHS and the District. Under the terms of the contract, which is expressly referenced in the complaint, any information provided by an employee using the EAP was to remain confidential. *See* Dkt. #32-3 at 3-4.

According to plaintiff, then-principal Gerard Iuppa, who himself was a licensed psychologist, understood the problems that plaintiff was dealing with, but was generally satisfied with plaintiff's work performance. Iuppa retired in January 2013.

Following Iuppa's retirement, defendant Lisa Buckshaw became the principal. Plaintiff alleges that with the knowledge and support of defendant Superintendent Kimberle Ward, Buckshaw sought to get rid of plaintiff. The reasons for her alleged animus toward plaintiff are not entirely clear, but at least part of it appears to stem from Buckshaw's alleged awareness that plaintiff had opposed Buckshaw's hiring because of her role in prior instances of illegal employment discrimination, against other employees. Complaint ¶¶ 91-93. (Aside from plaintiff's opposition to Buckshaw's appointment, those alleged acts of discrimination are unrelated to the events giving rise to this lawsuit.)

Over the course of the 2013-14 school year, Buckshaw allegedly took several disciplinary actions against plaintiff, relating to various incidents involving plaintiff's interactions with students and other teachers. Plaintiff alleges that these were essentially trumped-up charges and that Buckshaw, with Ward's support, was trying to manufacture a pretext for plaintiff's termination.

During the 2015-16 academic year, Buckshaw recommended plaintiff's termination. Pursuant to N.Y. Educ. L. § 3020-a, which generally provides that a tenured employee is entitled

3

to a hearing when charges have been brought against him, a hearing was held before an arbitrator/hearing officer. At that hearing, EHS's president/owner, Joseph DiMaria, testified pursuant to a subpoena issued by the District.

DiMaria testified at the hearing that he met plaintiff in 2014, based on a referral from the District pursuant to the EAP, requesting him to talk to plaintiff about "some concerns and issues the District had expressed." Plaintiff's Ex. 6 (Dkt. #26-7) at 110. DiMaria stated that those matters generally related to "[c]oncerns expressed by teachers who worked with Mr. Geer or about either some of his classroom activities [and] their relationships with him ... ." *Id.* at 112.

DiMaria further testified that he met with plaintiff on four occasions, as well as with some other District staff members, roughly between February and April 2014. He stated that in general, those other employees "felt intimidated, threatened in a sense [by plaintiff]. I don't think physical threat but feeling that Mr. Geer was aggressive and they felt intimidated by him, and they were afraid to express it because they felt some level of intimidation and retaliation." *Id.* at 113.

In his testimony, DiMaria said virtually nothing about any communications between plaintiff and him. DiMaria did indicate that he had relayed some of the other teachers' concerns to plaintiff. But following these meetings, DiMaria ultimately recommended that plaintiff be allowed to resume teaching, with "some more structure and supervision," at least initially, so that if further problems arose, they could be dealt with in an orderly way. *Id.* at 114. He testified that pursuant to his usual procedures, he also conducted a mental health screen of plaintiff, to see if any other issues needed to be addressed, but that "[n]one of the results indicated further treatment or test." *Id.* at 116.

In the end, however, plaintiff was discharged, mostly due to events that occurred after–consistent with DiMaria's recommendation–plaintiff was allowed to return to work. According to Buckshaw (who also testified at the hearing), the decision to terminate plaintiff was prompted in large part by an incident that occurred on September 24, 2015–some *fifteen months after* plaintiff's EAP sessions with DiMaria had come to an end, see Dkt. #26-7 at 118. On that date, Buckshaw was told by a staff member, shortly after the end of a fire drill, that there was shouting coming from plaintiff's classroom. Buckshaw stated that she immediately went to the room, where she found plaintiff yelling at his students, apparently because he believed that some of them had misbehaved in some manner during the drill.

Buckshaw told plaintiff more than once that she would "take if from here," whereupon plaintiff stopped talking and gestured with his arm as if to say, "They're all yours," and Buckshaw addressed the students, reminding them of the importance of behaving properly during fire drills. Buckshaw then left the room and plaintiff resumed teaching. *Id.* at 121-25. Based on the timing of the events, including her review of video from a security camera, Buckshaw estimated that plaintiff had been yelling at his students for some six minutes by the time she arrived.

Buckshaw also testified about several other causes for concern about plaintiff. These included complaints or reports from students and at least one parent about certain statements that plaintiff had made to his students. These need not be recited in detail here, but they included comments about plaintiff's belief that women should not be allowed to serve in the military (because their proper role is to stay home and raise children), making joking references to

5

pornography and to menstrual periods, embarrassing a student in front of the entire class because the student had failed a test, and so on.

Buckshaw, Ward and Assistant Superintendent John Brandon consulted with each other, and the decision was made to terminate plaintiff. Buckshaw testified that "Kim [Ward] really made a decision that that's it. We're done," but Buckshaw concurred with that decision. She testified that while she found plaintiff to have a "huge heart and a lot of passion," both staff members and students were afraid of him. She stated that he was simply "too unpredictable," and that she was "concerned that he will snap at a child and hurt them physically although we already know that he has harmed them emotionally." Dkt. #26-7 at 170-71.

After that decision was made, plaintiff presumably exercised his right to a hearing pursuant to § 3020-a. *See* Educ. L. § 3020-a(2)(f) (stating that "[t]he unexcused failure of the employee to notify the clerk or secretary of his or her desire for a hearing within ten days of the receipt of charges shall be deemed a waiver of the right to a hearing").

Following the § 3020-a hearing, the arbitrator issued a forty-two-page decision concluding that plaintiff was guilty of conduct unbecoming a teacher, and insubordination. He also ruled that the appropriate penalty was termination of plaintiff's employment. Dkt. #32-4.

Plaintiff commenced this action on March 15, 2017. The amended complaint asserts eight causes of action: (1) a claim against the District under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; (2) an analogous claim against the District, under the New York Human Rights Law, Exec. L. § 296; (3) a claim of intentional infliction of emotional distress ("IIED") against the District, EHS, DiMaria and Buckshaw; (4) a claim of fraudulent misrepresentation against the District, EHS, and the Gates Chili Board of Education ("Board");

(5) a claim under 42 U.S.C. § 1983 for violation of plaintiff's rights to free speech and free association, against Buckshaw, Ward, the District and the Board; (6) a § 1983 due process claim against the District, the Board, Buckshaw and Ward; (7) a claim under § 1983 and the ADA for disability discrimination against the District and the Board; and (8) a claim against the District and the Board for negligent retention and supervision of Buckshaw.

**DISCUSSION**

**I. Motion to Dismiss by EHS and DiMaria**

As stated, defendants DiMaria and EHS have moved to dismiss the claims against them, *i.e.*, the third and fourth causes of action. To date, no motions have been filed by the other defendants, *i.e.*, the District, Board, Buckshaw and Ward. Defendants EHS and DiMaria[2] primarily argue that plaintiff's claims against them must be dismissed because: (1) defendants are immune from liability for claims arising out of DiMaria's testimony at plaintiff's Education Law § 3020-a hearing; (2) plaintiff's emotional-distress claim is time-barred, and not supported by plaintiff's factual allegations; and (3) plaintiff has not alleged sufficient facts to give rise to a claim of fraudulent misrepresentation.

**A. Educ. L. § 3020(a) – Immunity**

Defendants state that plaintiff's claims against them arise out of DiMaria's testimony as a subpoenaed witness at plaintiff's hearing under N.Y. Educ. L. § 3020-a. That statute generally provides that a tenured employee has a right to a hearing when charges have been brought against

---

[2]Unless otherwise indicated, further references to "defendants" will be understood to refer to the moving defendants, *i.e.*, EHS and DiMaria.

him.  There is no dispute that DiMaria testified at that hearing pursuant to a subpoena.  *See* Dkt. #26-7 at 109; Dkt. #26-8.[3]

It has long been established under New York law that "statements uttered in the course of a judicial proceeding are absolutely privileged, 'as long as such statements are material and pertinent to the questions involved' in the proceeding."  *Stega v. New York Downtown Hosp.*, __ N.E.3d __, 2018 WL 3129383, at *5 (Ct. App. June 27, 2018) (quoting *Wiener v. Weintraub*, 22 N.Y.2d 330, 331 (1968), and *Marsh v. Ellsworth*, 50 N.Y. 309, 311 (1872)).  That immunity is not limited only to court proceedings, but extends to "a proceeding in court or one before an officer having attributes similar to a court."  *Stega*, 2018 WL 3129383, at *5 (quoting *Toker v. Pollak*, 44 N.Y.2d 211, 219 (1978)).  *See also Toaspern v. LaDuca Law Firm LLP*, 154 A.D.3d 1149 (3d Dep't 2017) ("A witness at a judicial or quasi-judicial proceeding enjoys an absolute privilege with respect to his or her testimony, as long as the statements made are material to the issues to be resolved therein") (internal cites and quotes omitted).

The Court of Appeals for the Second Circuit has held that a "Section 3020-a hearing is a quasi-judicial administrative action ... ."  *Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 308 (2d Cir. 2005).  The issue before the court in *Burkybile* was whether findings resulting from a § 3020-a hearing were entitled to preclusive effect in subsequent judicial proceedings.  But the salient point is that the court explicitly held that such a

---

[3]The Court has considered, and rejects, plaintiff's argument that the subpoena was somehow "defective."  Plaintiff's convoluted argument is based on his assertion that the federal Health Insurance Portability and Accountability Act ("HIPAA") only authorizes testimony concerning protected health information under certain conditions.  The subpoena, however, simply directed DiMaria to testify at a disciplinary hearing.  DiMaria did so, and he did not, in his testimony, disclose any protected health information concerning plaintiff.  *See* 45 C.F.R. § 160.103.  In addition, plaintiff made no objection to DiMaria's testimony at the time of the hearing, nor did he seek to quash the subpoena.  I also note that "HIPAA does not authorize a private right of action."  *Fero v. Excellus Health Plan, Inc.*, 236 F.Supp.3d 735, 777 (W.D.N.Y. 2017).

8

hearing *is* a quasi-judicial proceeding. Under New York law, testimony given at a quasi-judicial proceeding is absolutely privileged.

Another district court from this circuit has expressly held that absolute immunity attaches to § 3020-a hearings. In *Taylor v. Brentwood Union Free School District*, 908 F.Supp. 1165 (E.D.N.Y. 1995), the court held that two members of a hearing panel that suspended the plaintiff teacher, based on charges of misconduct, conduct unbecoming a teacher and insubordination, were entitled to absolute immunity for their role in his suspension. In reaching that conclusion, the court referenced "the avalanche of precedent from the lower federal courts which have repeatedly applied the [absolute immunity] doctrine to quasi-judicial officers in state administrative proceedings." *Id.* at 1174.

Although the *Taylor* court was dealing with hearing officers, as opposed to witnesses, that does not alter the result here. The *Stega* court's holding that statements uttered in the course of a judicial or quasi-judicial proceeding are absolutely privileged was not limited to statements by judicial officers. The court's focus was not on the speaker's status, but on whether the speech was material and pertinent to the questions involved in the proceeding. So long as the speech was uttered in the course of the proceeding, and both sides were entitled to participate in the proceeding, the speaker is absolutely immune from liability arising from that speech. 2018 WL 3129383, at *4-*5.

While *Stega* dealt with a defamation claim, which is not asserted here, that distinction makes no difference. The court in *Stega* held that certain statements made by the defendant were not privileged because the proceeding in question–a Food and Drug Administration ("FDA") review of a hospital's internal report relating to the plaintiff–provided the plaintiff no means to

9

challenge the accusations made against him by the defendant, who had spoken to an FDA investigator. In fact, the plaintiff in *Stega* had not even received notice of the FDA's investigation at the time the statements were made. 2018 WL 3129383, at *6.

In contrast, § 3020-a hearings are designed to give the subject of the hearings a "full and fair opportunity to litigate his claims." *Ferraro v. New York City Dep't of Educ.*, No. 13-cv-5837, 2017 WL 4402436, at *10 (E.D.N.Y. Sept. 30, 2017). *See Burkybile*, 411 F.3d at 312 ("Section 3020-a lays out extensive litigation procedures for hearings, including motion practice, bills of particulars, mandatory disclosure, discovery, subpoena power, right to counsel, cross-examination, testimony under oath, and a full record"). *See also Taylor*, 908 F.Supp. at 1174 (outlining procedural safeguards provided for by § 3020-a and concluding that the plaintiff's hearing was quasi-judicial, so as to give rise to absolute immunity).

There has been no suggestion here that plaintiff's hearing fell short of those standards, or that he was not given a full and fair opportunity to litigate the charges against him, particularly as to DiMaria's testimony. Plaintiff was represented at the hearing by an attorney, who expressly declined to cross-examine DiMaria. *See* Dkt. #26-7 at 119 (stating, after consulting with plaintiff, "we have no questions on cross").

Plaintiff argues that the § 3020-a proceeding was not quasi-judicial because of the limited scope of judicial review afforded to such proceedings. In support of that argument, plaintiff cites *Marek v. Old Navy (Apparel) Inc.*, 348 F.Supp.2d 275, 282 (S.D.N.Y. 2004), that "[a]n administrative proceeding is considered quasi-judicial when it is 'adversarial, result[s] in a determination based upon the application of appropriate provisions in the law to the facts and [is]

susceptible to judicial review'" (quoting *Park Knoll Assocs. v. Schmidt*, 89 A.D.2d 164, 171 (2d Dep't 1982), *reversed on other grounds*, 59 N.Y.2d 205 (1983)).

That argument might be persuasive, were § 3020-a hearings not susceptible to judicial review. But they are.

Section 3020-a provides that "[n]ot later than ten days after receipt of the hearing officer's decision, the employee or the employing board may make an application to the New York state supreme court to vacate or modify the decision of the hearing officer pursuant to section seventy-five hundred eleven of the civil practice law and rules." Section 7511 of the C.P.L.R. deals in general with vacating or modifying arbitration awards.

Review of the hearing officer's decision under § 3020-a is limited to the grounds set forth in C.P.L.R. § 7511(b)(1): (1) corruption, fraud or misconduct in the award's procurement; (2) bias on the part of the arbitrator; (3) a decision which shows the arbitrator exceeded his power or failed to clearly resolve the case; and (4) failure to follow the procedural guidelines. The arbitrator's decision must accord with due process, be supported by adequate evidence, and be rational and satisfy the arbitrary and capricious standards under Article 78 of the Civil Practice Law and Rules. *See Lackow v. Dep't of Educ.*, 51 A.D.3d 563, 567 (1st Dep't (2008)). These appellate measures were available to plaintiff, but he apparently declined to pursue them.

By any measure, the procedures set forth above constitute a right to judicial review. The scope of review may not be unlimited, but that is true of many judicial proceedings as well. In any event, as stated above, the Second Circuit has explicitly held that § 3020-a proceedings are "quasi-judicial."

I also note that the Second Circuit has held that absolute immunity attaches to witnesses at employment-related arbitration proceedings. *See Rolon v. Henneman*, 517 F.3d 140, 146 (2d Cir. 2008). While the parties in *Rolon* had contractually agreed to submit their dispute to arbitration–in other words, the arbitration was not provided for by statute, as here–the Court of Appeals' reasoning holds true in the case at bar: the witness at the arbitration proceeding "performed the same function as his judicial witness counterpart ... ." *Id.*[4]

The court in *Rolon* did "acknowledge ... that not all arbitrations will be conducted in a manner equivalent to that of the judicial process," and did not "opine as to the minimum safeguards required in order for absolute immunity to attach in other arbitral settings." 517 F.3d at 146. The court found it sufficient, in that case, to hold "that the arbitral proceeding at issue encompassed an adequate number of safeguards so as to ensure that its function and the function of the witnesses sufficiently mirrored the judicial process" to cloak the witness with absolute immunity for his testimony in the arbitration proceedings. *Id.* For the reasons stated above, I find that DiMaria's testimony was likewise sufficiently akin to that given by a witness in a judicial proceeding, to render him absolutely immune from liability for his testimony.

---

[4]In his memorandum of law, plaintiff states that he was "required to submit to an involuntary arbitration proceeding under the terms of Education Law §3020(a)." Dkt. #26 at 8.

By its terms, however, § 3020-a provides for a hearing only if the *employee* requests a hearing. *See* Educ. L. § 3020-a(2)(e), (f). If the employee fails to request a hearing within ten days of the receipt of charges, that failure is deemed a waiver of the right to a hearing. *Id.*

While this is not a dispositive issue, it certainly suggests that plaintiff's characterization that he was "forced" to submit to a hearing is inaccurate. Rather, he exercised his right to request a hearing.

### B. Plaintiff's Claims against DiMaria and EHS: Other Issues

The Court's conclusion that DiMaria's testimony is protected by absolute immunity renders it unnecessary for me to reach the merits of his claims against DiMaria and EHS, but it bears mention that even if the Court had not found that absolute immunity attaches to DiMaria's testimony, plaintiff's claims against defendants would be subject to dismissal on other grounds.

Again, in the third cause of action plaintiff alleges intentional infliction of emotional distress. Perhaps tellingly, the amended complaint contains not one mention of DiMaria or EHS in the third cause of action. Prior to that, the complaint states only that the District relied on information provided by DiMaria in deciding to terminate plaintiff. Dkt. #8 ¶ 75.

In the fourth cause of action, plaintiff asserts a claim for fraudulent misrepresentation. He alleges that DHS and DiMaria "made a material false representation to Plaintiff Geer by written assurances stating the Employee Assistance Program was confidential in nature." Dkt. #8 ¶ 187.

Under New York law, a plaintiff claiming IIED must plead four elements: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993)). "The first element sets a high bar to relief, requiring 'extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society.'" *Friedman v. Self Help Community Services, Inc.*, 647 Fed.Appx. 44, 47 (2d Cir. 2016) (quoting *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 157 (2d Cir. 2014)).

To establish fraudulent misrepresentation under New York law, a plaintiff must likewise prove four elements: (1) that the defendant made a material misrepresentation, (2) that the defendant intended to defraud the plaintiff thereby, (3) that the plaintiff reasonably relied on the misrepresentation, and (4) that the plaintiff suffered damage as a result of the misrepresentation. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004); *Keywell Corp. v. Weinstein*, 33 F.3d 159, 163 (2d Cir. 1994). "Fraud must be pled with particularity, Fed.R.Civ.P. 9(b), which requires that the plaintiff '(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Eternity Global*, 375 F.3d at 187 (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996)).

In the context of this case, given the paucity of plaintiff's allegations, simply to recite the elements of these claims underscores the deficiencies in plaintiff's third and fourth causes of actions against DiMaria and EHS. There are no actionable claims here.

At the most fundamental level, DiMaria did not say anything in his testimony that would give rise to a claim of IIED or fraudulent misrepresentation, against him or EHS. Having reviewed DiMaria's testimony (which was relatively brief, and takes up ten pages of a double-spaced transcript), the Court has found nothing in that testimony that could reasonably be viewed as disclosing any confidential information, or stating anything obviously likely to cause plaintiff emotional distress. DiMaria's testimony, like his report, was *favorable* to plaintiff. He recommended that plaintiff be returned to work, with some recommendations for how everyone concerned could best handle any future problems that might arise, and he said that he found no

14

mental or psychological problems warranting further attention.  How was plaintiff harmed by such testimony?

Nor has plaintiff identified any statements by defendants that could support a fraudulent-misrepresentation claim.  Defendants may have assured plaintiff that statements made, or information disclosed in the course of his EAP sessions would remain confidential, but nothing that DiMaria said in his testimony could reasonably be construed as violating those assurances.

DiMaria's testimony relating directly to his interactions with plaintiff took up only about half of his total testimony, which as noted was brief to begin with.  *See* Dkt. #26-7 at 113-18.  He mostly testified about what he had learned from or about other staff members, regarding their concerns about plaintiff.  He said that he had met with plaintiff on five occasions, but in his testimony he disclosed nothing that plaintiff had said to him, or he to plaintiff.

DiMaria also prepared a three-page handwritten report summarizing his findings and recommendations, which he submitted to the District.  That report was admitted into evidence during the § 3020-a hearing.  *See* Dkt. #26-7 at 115, #41-1.

Like his testimony, DiMaria's written report contains nothing that could remotely be construed as disclosing confidential information.  To the extent that DiMaria even wrote about plaintiff directly, he stated that plaintiff had "been fully cooperating," that he was "in full compliance with [the] referral," and that DiMaria could not "identify any reason for not returning

[plaintiff] to the workplace." Dkt. #41-1 at 24. That is hardly the stuff of which tort claims are made.[5]

I also agree with defendants that plaintiff's IIED claim is time-barred. Under New York law, a claim for IIED is subject to a one-year statute of limitations. *See, e.g., Rentas v. Ruffin*, 816 F.3d 214, 226 (2d Cir. 2016) ("In New York, an IIED claim must be brought within one year of the injury"). Plaintiff's IIED claim is based on DiMaria's testimony at the § 3020-a hearing, which occurred on February 23, 2016. Plaintiff filed the complaint in this action over a year later, on March 15, 2017.

Plaintiff argues that his IIED claim did not accrue until the arbitrator issued his decision on April 6, 2016. But the focus should be on the underlying *acts* by the defendant, not when plaintiff felt the *effects* of those acts. *See Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (limitations period on plaintiff's discrimination claim commenced at the time defendants communicated to him his denial of tenure, even though one of the effects of that denial–his loss of a teaching position–did not occur until later). Plaintiff was present at the hearing, when DiMaria testified, and the harm that he alleges was the alleged disclosure of what should have been confidential, private information. As explained above, no such disclosure occurred, but

---

[5]I also note that on February 17, 2014, plaintiff signed a form–a copy of which plaintiff has submitted–entitled "Authorization to Use or Disclose Protected Health Information (PHI)" (Dkt. #26-6.) In that document, plaintiff gave his permission to EHS to use or disclose information to the District for a number of purposes, including whether he was participating in the EAP, his counselor's assessment, and plaintiff's compliance with his counselor's recommendations. Plaintiff also signed a "Statement of Understanding" stating, *inter alia*, that EHS could use or disclose plaintiff's protected health information without his consent when required by law, including in "[j]udicial, administrative or criminal prosecutions." Dkt. #32-3.

Both sides have submitted copies of those documents, and their seems to be no dispute about their authenticity. Since the documents are not expressly referenced in the complaint, they are outside the pleadings, and the present decision does not rest upon them. But it is worth pointing out that by his own admission, plaintiff agreed that EHS could disclose basic information about his participation in the EAP, or other information as required by law. That is essentially all that DiMaria did here, with no contemporaneous objection by plaintiff.

even assuming that there was such a wrongful disclosure, that is when the IIED claim accrued. *See also Santan-Morris v. N.Y.U. Med. Ctr.*, No. 96 CIV. 0621, 1996 WL 709577, at *4 (S.D.N.Y. Dec. 10, 1996) (declining to extend limitations period on emotional-distress claim based on effects of prior conduct).

**II. Plaintiff's Motion for Leave to Amend**

Plaintiff has moved for leave to amend his complaint, to add claims for "professional malpractice" and breach of contract. *See* Dkt. #37-1 at 33-37.[6] The former is asserted against DiMaria and EHS, while the latter is asserted against DiMaria, EHS, the District and the Board.

Rule 15(a)(2) directs a court to "freely give leave [to amend a complaint] when justice so requires." *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Although that is a liberal standard, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015), the court has discretion to deny such a motion when the amendment would be futile, *see Foman*, 371 U.S. at 182.

"An amendment to a pleading is futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). In other words, a proposed amended complaint must still contain "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). *See also Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam) ("Where

---

[6]Though captioned separately, the malpractice and contract claims are both listed under the "Ninth Cause of Action." It appears that this may have been a clerical error and that the contract claim should have been designated the tenth cause of action.

it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend").

Under any caption, or theory of liability, plaintiff's claims against DiMaria and EHS remain meritless. Simply repackaging them in a different guise will not save these claims. DiMaria did not divulge any confidential information. In short, there was no malpractice and no breach of contract.


### III. Plaintiff's Motion to Compel Discovery

Plaintiff has filed a motion (Dkt. #45) to compel responses to his discovery demands, against DiMaria and EHS. The basis for the motion is essentially that plaintiff believes there is evidence that prior to his testimony at the § 3020-a hearing, DiMaria met with counsel for the District. The significance of that eludes the Court.

The motion is denied as moot. Plaintiff has not shown a reasonable basis to believe that the requested discovery would alter the outcome of this case in any way. Even assuming that DiMaria did meet with the District's attorney, plaintiff has not demonstrated how the information that he seeks would be likely to shore up his claims against DiMaria and EHS, which for the ample reasons stated above are fatally flawed.


## CONCLUSION

The motion by DiMaria and Employee Health Referral Systems, Inc., d/b/a Employee Health Systems ("EHS") to dismiss the complaint (Dkt. #24) is granted, and plaintiff's claims against those defendants are dismissed.

Plaintiff's motion by plaintiff for leave to file a second amended complaint (Dkt. #37), and his motion to compel production of certain discovery-related documents (Dkt. #45), are denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      July 25, 2018.