UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WESLEY GEER,

         Plaintiff,

      v.

GATES CHILI CENTRAL SCHOOL DISTRICT,
et al.,

         Defendants.
_____

<u>DECISION AND ORDER</u>

17-CV-6161L

## INTRODUCTION

Plaintiff Wesley Geer ("Geer") was a tenured teacher with the Gates Chili Central School District ("District"). The District took steps to terminate Geer in 2016. The District served Geer with a complaint containing five charges of misconduct. As was his right, Geer requested a hearing under Education Law § 3020-a.

After five days of testimony, the hearing officer, John Trela, issued a thorough decision finding Geer "guilty" on all of the charges and determined that termination was the appropriate penalty. Geer sought judicial review of that decision pursuant to § 3020-a(5) of the Education Law by commencing a proceeding under N.Y. CPLR § 7511. Geer was unsuccessful on that appeal. The New York Supreme Court, Monroe County (Thomas A. Stander, J.) issued a written decision denying Geer's petition for review and confirmed the hearing officer's decision.

During this time, Geer also filed an administrative complaint with the Equal Employment Opportunity Commission ("EEOC") alleging a violation of the Americans with Disabilities Act

("ADA").  At Geer's request, the EEOC issued a right-to-sue letter (Dkt. # 6-3), after more than

180 days had passed without a decision by the EEOC.

Geer, unsuccessful in his other efforts to vacate his termination, now brings his claims to

federal court.

Geer filed this action on March 15, 2017, alleging that he was terminated from his

employment as a teacher with the Gates Chili Central School District ("District") in 2016, in

violation of his federal civil rights and New York law.  Plaintiff filed an amended complaint on

May 31, 2017, asserting claims against the District, the Gates Chili Board of Education

("Board"), Superintendent of Schools Kimberle Ward, Gates Chili Middle School Principal Lisa

Buckshaw, Employee Health Systems ("EHS"), and EHS's owner, Joseph DiMaria.

On July 25, 2018, the Court issued a Decision and Order (Dkt. #54) dismissing plaintiff's

claims against EHS and DiMaria.  321 F.Supp.3d 417.  The Court also denied plaintiff's motions

for leave to file a second amended complaint adding new claims against EHS and DiMaria.

After the Court granted plaintiff's unopposed motion under Rule 54(b) of the Federal

Rules of Civil Procedure for the entry of final judgment as to his claims against EHS and

DiMaria, plaintiff appealed from the Court's July 2018 decision.  The Court of Appeals for the

Second Circuit affirmed that decision in a summary order.  768 F.App'x 55 (2d Cir. 2019).

Discovery is now complete, and both sides have moved for summary judgment.  The

Court heard oral argument on the motions on September 1, 2021.

After reviewing the voluminous record, and the pleadings filed in connection with the

motions for summary judgment, I conclude that Geer's claims under the federal statutes lack

merit and, therefore, defendants' motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied.  The complaint is hereby dismissed.

### FACTUAL BACKGROUND[1]

Geer was hired in 1999 as a middle school social studies teacher.  He was granted tenure prior to the start of the 2002-2003 academic year.

Although Geer's performance appears to have been generally satisfactory, at least at the outset, at some point his record began to be punctuated by what became a long series of incidents, mostly involving Geer's loss of his temper, angry outbursts and otherwise inappropriate behavior toward and around both his students and coworkers.  Those incidents would lead to Geer's eventual termination in April 2016.[2]

The first such incident that appears in the record occurred on or about March 30, 2006, when Geer received a counseling memorandum from the school's then-principal, Gerald Iuppa, regarding inappropriate behavior on Geer's part toward a coworker, Katherine Mullen. Apparently Geer and Mullen had gotten into an argument concerning an incident in the school cafeteria, and later that day Geer confronted her in a manner that, according to Iuppa, other staff members who were present found alarming because of the "intensity" of Geer's behavior.  Dkt. #112-7 at 2.  Iuppa stated that because Geer's actions stood out "as an anomaly to [Geer's] usual conduct," *id.*, Iuppa was not taking disciplinary action at that time, but he did remind Geer of

---

[1] Unless otherwise noted, all the facts recited here are taken from the parties' Rule 56 statements and are undisputed.

[2] Although plaintiff alleges that he was terminated for discriminatory and retaliatory reasons, the record makes clear that regardless of defendants' motives, it was these incidents that formed the grounds for plaintiff's termination, as explained below.

"the potential for disciplinary action for disrespectful or hostile acts toward a colleague." *Id.* at 3.

On April 8, 2010, Iuppa issued a second counseling memorandum to Geer, this time stemming from an incident involving Geer and a student. That incident began when Geer reprimanded the student after he heard, or thought he heard her use a racial slur in the school hallway. She responded in a way that Geer considered disrespectful, and eyewitnesses reported that he started yelling at her, in what one teacher who witnessed the event described as a "face to face" and "very intense manner." Dkt. #112-9 at 2.

Geer and the student went to the office of then-assistant principal Lisa Buckshaw. Buckshaw later stated that Geer "became increasingly agitated," and again got face-to-face with the student. Iuppa stated in his memorandum that "[b]ecause of the perceived intensity of Mr. Geer's behavior, Dr. Buckshaw asked him to leave," and that she found it necessary to repeat that directive and physically escort him out of her office. At that point, the student was crying and shaking. *Id.* at 3.

In his memorandum of counsel to Geer, Iuppa stated that it was important for Geer to understand that his behavior was frightening both to the student and to Buckshaw, and that Iuppa was concerned that Geer seemed unaware of how his behavior affected those around him. He stressed "the absolute need [for Geer] to suppress [his] anger in cases of managing student behavior." *Id.* Iuppa concluded by stating, "While my reactions in this memo are couched in the framework of counsel, I must also be clear that any similar actions towards students would likely result in disciplinary action." *Id.* at 4.

A third incident occurred in early June 2011.  Following the incident, Geer met with Iuppa in Iuppa's office.  Iuppa summarized that meeting in a memo to Geer dated June 14, 2011.[3]

Iuppa wrote that he asked for the meeting after learning of an "angry exchange from Mr. Geer toward Mrs. Stuebing," who was a math teacher.  Geer was angry that Stuebing had scheduled a math exam for the same day that Geer had previously scheduled a social studies exam.  In the memo, Iuppa stated that his comments to Geer centered on "the intensity of [Geer's] anger in response" to the situation.  Dkt. #112-10 at 2.  Iuppa noted that there were already two counseling memos in Geer's personnel folder concerning similar behavior.

Iuppa observed that although Geer was a "dedicated teacher" who "contribute[d] much to this district and community," Geer's "unpredictable anger outbursts are ... damaging relationships with his colleagues by creating fear and resulting in a lack of willingness on the part of some to want to work with him." *Id.*  He stated that Geer himself acknowledged during the meeting that he had "lost it" and that Geer "revealed that he ha[d] very recently sought medical assistance and counseling for Post Traumatic Stress Disorder" ("PTSD").  Iuppa stated that he "supported [Geer's] decision to seek assistance," but that he was compelled to rate Geer's performance that year as "unsatisfactory" in the area of "establishing professional relationships," and said that he could not support Geer as the teacher-in-charge for the social studies department for the coming year.  *Id.* at 3.  Geer concluded, "I feel very strongly that the reoccurrence of angry displays is unacceptable and must come to a definitive end." *Id.*

---

[3] According to the memo, two other persons, Mr. Olin and Mr. Barleben, were also present at the meeting. Their roles are not apparent.

Following that meeting, on October 5, 2011 Geer and Iuppa both signed a "Corrective Action Plan" ("CAP"), addressing how Geer could remedy his ongoing difficulties dealing with people at school.  Dkt. #112-12.  In the CAP, Iuppa wrote that Geer, "[f]ollowing through on the directive to reflect upon a plan for corrective action," had come up with a number of "strategies for implementing change."  *Id.* at 2.

Iuppa quoted Geer as stating that even before the incident that precipitated the June 2011 meeting, he had "started taking action" because he realized that he had "always come across much more strident than [he] realize[d] ... ."  *Id.*  Geer said that his doctor had "put [him] on an increased dose of anti-depressants" and that he was seeing a counselor.  He added that he had been diagnosed with PTSD and that he "suffer[ed] from panic disease ... ."  *Id.*

Geer stated that it was his "plan to continue in counseling" and that he was "learning strategies to deal with [his] frustration and anger."  He said that he would "continue to see [his] therapist on a consistent schedule and implement the strategies she ha[d] given [him]."  *Id.* at 2-3.

After reciting Geer's proposed plan, Iuppa stated that as Geer's supervisor, he found Geer's plan "conscientious and appropriate."  Iuppa added that since Geer's counseling sessions and medical treatment were private, he would not require Geer to divulge the details of those matters, but Geer was "to keep a journal of personal reflection specifically around his interpersonal relationships" relating to his duties as a teacher, and that the journal could "be used as a reference for monthly discussions" between Iuppa and Geer.  *Id.* at 3.

On January 25, 2012, while the CAP was still in effect, Geer received another memorandum of counsel from Iuppa, relating to an incident on December 14, 2011.  According

to Iuppa, on that date Geer reprimanded a student who had arrived ten minutes late for class.

Three staff members who were passing by the classroom "expressed concern about the volume

and intensity" of the confrontation between Geer and the student.  Dkt. #112-14 at 2.

Iuppa stated that one of the staff members summoned another teacher, who went to

Geer's classroom and attempted to defuse the situation.  That was apparently successful, and the

class continued, but according to a guidance counselor, after the class period a different student

from the class went to the guidance center to express his concern.  The student reportedly said

that Geer had mocked the tardy student and said that he would get the student kicked off the

basketball team, and that eventually the student began crying.  The student who went to the

guidance office told the counselor that he and other students in the room felt afraid while this

was going on.  *Id.*

In the memo, Iuppa stated that he had "considerable concern" over this incident,

particularly considering that Geer was in the midst of his CAP, which had been developed as a

result of Geer's prior "angry outbursts ... ."  *Id.*  Iuppa wrote that instead of simply "truncat[ing]"

the argument by removing the student from the classroom, Geer became "determined to win this

apparent power struggle."  *Id.* at 3.  Iuppa stated that although he was "one of Mr. Geer's

strongest supporters," and despite Geer's statements that he had "sought medical assistance and

outside counseling," the incident in question "calls into question whether or not he is making

progress in conquering factors that may dispose him to behave inappropriately when in conflict."

*Id.* at 4.

Iuppa decided to give Geer "one last opportunity to address his anger in these situations," and to that end, Iuppa directed Geer to participate in a Therapeutic Crisis Intervention course.[4] Iuppa then added this stern, unequivocal warning:

> I must make it clear at this time that there is no room for another angry and belittling outburst toward a student or staff member without a series of escalating disciplinary actions being brought by the school district, up to and including (after an appropriate investigation confirming such misbehavior) suspension from his duties as a teacher.

*Id.*

In Geer's job performance evaluation for the 2011-2012 school year, which was authored by Iuppa, he gave Geer generally positive ratings.  Under the heading, "Establishes professional relationships with pupils, faculty, other school personnel, parents, and the larger community," Iuppa gave Geer a "C" (competent) rating.  Iuppa wrote, "You no longer deserve to be rated as unsatisfactory in this area, and you no longer are in need of an improvement plan to address it."  Dkt. #112-15 at 4.  *See also* Geer Depo. Tr. (Dkt. #112-4) at 28 (agreeing that as of June 2012, the CAP "was completed").  When the 2012-2013 school year began, then, Geer was no longer subject to the CAP.

Iuppa retired in January 2013, and was replaced as principal by defendant Buckshaw, who had been serving as the assistant principal since 2006.  Prior to her hiring by Gates Chili in 2006, Buckshaw was employed by the Greece (New York) Central School District as an assistant superintendent of schools.

On or about June 20, 2013, a teacher, Julie Simons, informed the District that Geer had made two comments to her in the presence of students that she considered inappropriate.  The

---

[4] Geer alleges that this was essentially his idea.  *See* Geer Aff. ¶ 22 ("Although not memorialized in the Corrective Action Plan, I asked for training or instruction that would help me deal with my disorders").

first occurred during a class on May 24, 2013.  Simons stated that Geer said to her that a female student had told him that Simons was so well liked by her students because she was "young, beautiful, and has a great rack!  Oh, and nice too."  Dkt. #112-16.  Simons said that Geer later thanked her "for not being offended by his sexual reference remark, some people would think that was sexual harassment."  *Id.*

The second comment was made in Geer's classroom during his social studies class on June 5, 2013.  Simons wrote that she had just finished administering a test to a male student and that she accompanied that student to Geer's classroom, because she wanted to let Geer know why the student was late for Geer's class.  Simons wrote that Geer said, in front of the class, that he wondered if that was a backpack the student was carrying, or a saddle, because "you [Simons] were riding on him hard."  *Id.*  When some students laughed (and others, according to Simons, looked surprised), Geer told them "to get their minds out of the gutter!"  Simons wrote that Geer then said that he was just referring to the cane the male student was using, "wondering if it was a whip used to whip Mrs. Simons in shape."  *Id.*  When Geer saw the expression on Simons's face, he asked her, "Is your mind in the gutter too?"  *Id.*  Simons said that she replied, "No I was thrown in the gutter and then trampled upon!" and walked out of the room.  She stated that Geer later apologized to her in private.  *Id.*

Five days after Simons submitted her written report, on June 25, 2013 Geer was involved in a verbal altercation with a colleague, Chad White, while they were working on a curriculum project with other social studies teachers.  In a memorandum to Buckshaw, which was apparently written later that day, White stated that during that session, someone mentioned a decision that the United States Supreme Court had issued earlier that day.  According to White,

he and Geer had differing opinions about the decision, but Geer would not let the matter drop, and became "very agitated and confrontational ... ."  Dkt. #112-17 at 2.  Two other teachers told Geer to stop, but he persisted, until White said, "Wes, shut the f— up, please!"

White wrote that Geer persisted in his hostility, however.  He allegedly pointed his finger at White and said that if White ever said anything like that again, he would "bury [White]" and "knock [him] out."  White said that he later apologized to Geer for saying what he did, but added that he "did not appreciate [Geer] attacking [him] as well."  Geer allegedly told White that Geer could "easily kick [White's] ass."  White stated in his memo that Geer's verbal harassment continued in the school parking lot as White was walking to his car.  *Id.*

The District undertook an investigation of these incidents, but it does not appear that there were any immediate consequences.  At the start of the next school year, however, Geer approached and spoke, separately, to two of the teachers who had witnessed the incident with Chad White.  Both of those teachers immediately informed Buckshaw in writing.

In a memo dated September 4, 2013, Mary Jane Brennan stated that on that date, she entered her classroom and found Geer talking to a teaching assistant.  After another person entered the room, Geer pulled Brennan aside and told her that he was sorry if she was offended when she witnessed the June confrontation between him and White.  Geer added that he "wasn't going to be talked to that way," *i.e.*, the way White had talked to him, and "said something about being an 'alpha male.'"  (Dkt. #112-18 at 3.)  Brennan stated that she tried to change the subject and the conversation came to an end.  She wrote that "[t]he situation was uncomfortable not only because there were other people in the room but [because] I had been asked not to talk about it."  The latter statement was an apparent reference to a directive issued by the District during its

-10-

investigation of the incident involving Geer and White, to the effect that the participants and witnesses were not to discuss the matter with anyone while the investigation was ongoing.

Another teacher, Kathy White (apparently no relation to Chad White) also wrote a memo to Buckshaw on September 4, stating that on that day Geer came to her classroom to talk to her about the events of June 25. According to White, Geer told her that he wanted to explain what had made him so angry. White wrote that she "tried to steer the conversation in a positive direction," but that "Wes continued to insult Chad and complain about his behavior." *Id.* at 2. Echoing what he had said to Brennan, Geer reportedly told White, "I'm the alpha male and I'm not going to take that from him." White wrote that she told Geer that she did not want to be in the middle of the conflict between him and Chad White, and he responded, "You put yourself in the middle."

In her memo, Kathy White stated that Geer's comment about her having put herself in the middle "was very disturbing to me," and that "this situation is causing me emotional distress." Although White opined that neither Geer nor Chad White had behaved appropriately on June 25, she clearly believed that Geer was continuing to pose a problem within the department. White stated that "Wes is making no attempt to cooperate within our department," and asked rhetorically how the members of the department would be able to work together "if Wes clearly will not back down or move forward from what happened?" *Id.*

As a result of Brennan's and White's reports, Buckshaw met with Geer on September 5, 2013. Also present were John Brondon, the Assistant Superintendent for Administration and

Personnel, and Carol Stehm, who was present in an "ASI role." (Dkt. #112-20 at 2.)[5]  At that meeting, Geer was informed that he was being placed on administrative leave with pay, pending an investigation.  According to Buckshaw's notes from the meeting, Geer acknowledged that he had been told not to talk to anyone about the June 25 incident while that investigation was continuing, but he stated that because of the amount of time that had passed, he had assumed the investigation was over, and he wanted to "clear the air." *Id.* at 3.

In a letter dated May 8, 2014, District Superintendent Ward informed Geer of the results of the District's investigation of the incidents of May 24, 2013 (involving Geer's "great rack" comment to a female teacher), June 5, 2013 (involving the "saddle" and "riding him hard" comments), June 25, 2013 (the confrontation with Chad White), and September 3, 2013 (Geer's statements to two teachers who had witnessed the June 25 incident). (Dkt. #112-21 at 2.)[6]  Ward stated that the District found that Geer had acted inappropriately on each of those occasions, and that as a result, Geer would be issued a reprimand.

Ward's letter also referenced the District's Employee Assistance Program ("EAP").  In conjunction with his administrative leave, and at the direction of the District, Geer met on several occasions in early 2014 with Joseph DiMaria, a licensed clinical social worker and the owner of Employee Health Systems, which had contracted to provide services to the District.  In her May 8 letter to Geer, Ward stated that this counseling was needed "to assure the District that you can function with the staff and team members in a non-destructive, non-threatening and

---

[5] It is not apparent what Stehm's job title was, but she does not seem to have taken any actions relevant to Geer's claims in this lawsuit.

[6] Ward's letter states that the last of those incidents occurred on September 3, but in other parts of the record it is said to have occurred on September 4.

appropriate manner" as "a prerequisite to return to work." (Dkt. #112-21 at 2.) She added that "the District reminds you of the EAP that is free to you, anonymous and confidential should you be in any need of future assistance and or counseling." *Id.*

In a separate document also dated May 8, Ward recited the basic facts concerning the four incidents that had been under investigation, including Geer's statement to Chad White "to the effect [Geer] would 'kick his ass' or 'beat him to the pavement.'" *Id.* at 3. She stated that all the comments Geer had made in the incidents in question "were inappropriate and unprofessional." Ward added, "Any further incidents of this nature will result in disciplinary actions which may lead up to and include termination from employment." Ward informed Geer that he was "hereby reprimanded for [his] behavior." Geer signed the document at the bottom to acknowledge his receipt of the reprimand. *Id.*

Geer returned from administrative leave on or about June 2, 2014, pursuant to a "re-entry plan," the details of which were memorialized in a memorandum from Buckshaw to Geer, which was dated May 2014 and signed by both of them on June 2. Under that plan, Geer would work half days until the end of the school year on June 26. During that time, he would not immediately resume teaching, but would, "engage in professional dialogue" and "shadow" other teachers. (Dkt. #112-22.)

Geer was also not to talk to anyone about why he had not been at school, other than to say that he "missed being here" and was "glad to be back," and he was expected to "speak professionally and appropriate to staff" at all times. He was also given guidance on how to extricate himself from interactions that he thought were becoming tense. The plan further stated that Geer would be given several texts that he was expected to read, which were intended to help

him.  Finally, the plan stated that Geer was to keep a journal "regarding [his] reflections on the readings and classroom shadowing."  *Id.*

Geer resumed classroom teaching at the start of the 2014-2015 school year.  Apparently there were no incidents to speak of until May 5, 2015.  On that date, Geer was involved in an altercation with a student in a school hallway.  Although the parties' accounts of this incident differ in some respects, there appears to be no dispute that there was a confrontation that involved some physical contact between Geer and the student.

According to Geer, he heard a loud disturbance in the hallway, went out to find a student behaving in a disruptive manner, and "asked the student to calm down," whereupon the student told him to "fuck off."  Geer states that he began walking away, and the student said to him, "You'd better walk away.  I'm going to knock you the fuck out."  Geer told the student to go to the assistant principal's office, and when the student refused, Geer placed his hand on the small of the student's back to "direct" him to the office, and "after a brief time," the student complied. After Geer and the student arrived at the assistant principal's office, the student and the assistant principal engaged in a physical struggle.  Geer states that after the assistant principal had restrained the student (apparently without Geer's assistance), Geer left the office.  Geer Aff. (Dkt. #118-7) ¶ 26.

Buckshaw and Ward state in their affidavits that they investigated the incident, and although they do not appear to deny that the student acted in a hostile manner (Buckshaw states that the student told Geer that the student would get his father to beat Geer up), they both agree that Geer escalated the situation, and that at one point he pushed the student from behind. Buckshaw also states that Geer put his finger on the student's chest, while Ward describes Geer

-14-

as "pointing his finger into the student's chest." Buckshaw Aff. (Dkt. #112-6) ¶¶ 17-22; Ward Aff. (Dkt. #112-5) ¶¶ 12, 13.

Buckshaw states that during her investigation of this incident, she became aware of another incident that had occurred on or around April 24, 2015, in which Geer had pushed a different student. Buckshaw Aff. ¶ 23. In an "executive summary" dated May 6, 2015, Buckshaw memorialized her findings concerning that incident, in which she states that a video recording showed that Geer told a student to stop running in the hallway, an "exchange of words occurred," and as the student started walking again, Geer "reached out and grabbed him backwards and then gave him a shove as he moved forward down the hallway." (Dkt. #112-24 at 3.)

Superintendent Ward then met with Geer and his union representative to discuss these incidents. At the meeting, she showed Geer videos of both incidents.

After some discussion, Geer and the District entered into a settlement agreement, which was signed by Geer on May 22, 2015, and by Ward on May 27, 2015. (Dkt. #112-25.) That agreement stated that the District had informed Geer that the District was prepared to seek his termination, and that Geer agreed to accept a twenty-workday unpaid suspension from May 18 to June 12, 2015, to avoid that happening.

In consideration of the District's agreement not to bring disciplinary charges against him in connection with the April 24 or May 6 incidents, Geer agreed to a number of things, including "see[ing] a counselor of his choice to address these issues ... ." *See* Settlement Agreement (Dkt. #112-25) at 2. He also signed off on a broad release of any claims against the District relating to his employment. *See id.* at 1 (stating that parties "hereby settle and resolve ... all pending, actual,

or potential grievances, charges, and claims relating to Geer's employment with the District"), 2

¶ 8 (stating that Geer agreed not to assert claims or causes of action under "federal, state or local

laws, rules or regulations"), and 4 ¶ 19 (stating that Geer releases the District and its agents and

employees "from any and all claims ... which Geer now has or may have against the released

parties arising out of employment or the execution of this agreement").  The settlement

agreement also stated, "This Release is a release of both known and unknown claims, but is not a

release of future rights or claims that may arise after termination." *Id.* ¶ 19.

Geer returned to his teaching duties at the start of the 2015-2016 school year.  It was not

long before more problems arose.

On September 24, 2015, there was a fire drill at the school, during which the students and

staff left the building until the drill was over.  After everyone re-entered the building and

returned to their classrooms, Geer began reprimanding his students for what he considered

inappropriate behavior while they were outside.

The parties' characterizations of Geer's statements to his students differ, but there is no

dispute that he did raise his voice, or at least spoke in a loud voice.  Buckshaw states that after

being told by a guidance counselor that the counselor could hear Geer yelling at his students,

Buckshaw walked to Geer's room and saw and heard him "screaming angrily and loudly at his

students in an agitated manner."  Ward did not witness the event, but states that she was told by

Buckshaw that Geer was "very angry" and "was shouting and yelling inappropriately" at his

students.  Geer denies yelling, but states that his "voice is naturally loud," and that he "spoke in a

stern tone ... ."  Buckshaw Aff. ¶ 30; Ward Aff. ¶ 20; Geer Aff. ¶ 53.

-16-

Buckshaw entered Geer's classroom and told Geer that she would "take it from here." Geer stopped speaking, and Buckshaw addressed the class, telling the students that their behavior during the fire drill had been inappropriate and that she was confident it would not happen again.  After a few minutes, Geer began teaching, and Buckshaw left.

Buckshaw states that the next day, she received an email from a parent of one of Geer's students, who said she was upset about some comments that Geer had made during a September 24 class pertaining to women in the military.  Buckshaw Aff. ¶ 33.  The parent characterized Geer's comments as "antiquated," "misogynistic," "unprofessional," and "irresponsible."  (Dkt. #114 at 6.)  According to Buckshaw, that same day another student told a school counselor that she was uncomfortable going back to Geer's class because of those comments.  Buckshaw Aff. ¶ 34.

Buckshaw began to look into the circumstances of both the fire drill episode and the "women in the military" matter.  She states that during the course of this investigation, she learned about some other incidents that had recently occurred involving Geer.  In one of those, Geer had allegedly spotted a chocolate milk stain on a student's chair, and said to a student who was in the classroom at the time that someone must have gotten her period.  Buckshaw Aff. ¶ 36(a).  In another, a student in Geer's study hall asked if he could use his phone to read, and Geer responded, "As long as you're not watching porn."  *Id.* ¶ 36(b).  On another occasion, Geer allegedly made fun of a student and told him in front of the class that Geer was going to get him kicked off the football team.  The next day Geer announced in front of the class that the student had gotten a zero on a quiz.  *Id.* ¶ 36(c).

Buckshaw prepared another "executive summary" setting forth what she had learned about these events.  The summary, which is dated September 29, 2015 and addressed to John Brondon, goes into somewhat more detail, but essentially tracks the descriptions of these events recited above.  (Dkt. #114 at 2-5.)

Geer's account of these incidents is very different from Buckshaw's.  He states, for example, that the stain on the chair *was* blood, that he never expressed any personal opinion about whether women should serve in combat, and that he never identified the student who got a zero on a quiz, but simply told the class in a general way that a student had refused to take the quiz, that doing so results in a score of zero, and that it is therefore always better to take a quiz, even if the student feels unprepared.  Geer also states that Buckshaw never spoke to him about these matters to get his side of the story, before preparing her executive summary.  Geer Aff. ¶¶ 63-77.

In any event, it is undisputed that Ward decided to bring disciplinary charges against Geer pursuant to Educ. L. § 3020-a, which relates to disciplinary procedures and penalties against tenured teachers.   In a Statement of Charges signed by Ward on October 27, 2015 (Dkt. #112-28), Geer was charged with five infractions.  The first charge alleged "conduct unbecoming a teacher/immoral character/insubordination/neglect of duty," based on "inappropriate and/or excessive and/or angry volume and/or tone and/or body language and/or action," in connection with the fire drill episode and other incidents in September 2015.  The second charge asserted the same infractions, based on "inappropriate and/or unprofessional statements and/or comments to and/or in the presence of students."  That charge stemmed from various statements that Geer

-18-

had allegedly made, including his comments about women in the military, a student "watching porn" on his phone, and other statements.

The third charge asserted the same infractions, based on "disclosing confidential student information in contravention of the Family Educational Rights and Privacy Act." That charge was based on Geer's alleged statement in front of his social studies class that one student, "M.J.," received a zero on a quiz. (That statement also formed part of the basis for the second charge.)

The fourth charge asserted insubordination and neglect of duty, based on "entering classroom and/or making contact with substitute despite prior directives." This charge alleged that on June 16, 2015 (the day after he returned from administrative suspension), Geer entered his classroom while a substitute teacher was teaching, in contravention of Buckshaw's express directive that he "was not to go into his classroom for the remainder of the school year without first obtaining permission" from Buckshaw or the assistant principal. Buckshaw Aff. ¶ 26.

The fifth and final charge alleged conduct unbecoming a teacher, immoral character, insubordination, and /neglect of duty, based on Geer's "failure to maintain appropriate and/or professional behavior despite progressive discipline." (Dkt. #112-28 at 17.) In addition to incorporating by reference the allegations in the first four charges, this charge also alleged several inappropriate statements by Geer toward or about fellow teachers, including his alleged statements that a female teacher's students liked her because of her "rack," that a teacher had been "riding" a male student too hard, and that he would "kick [another teacher's] ass." The charge also recited prior reprimands and disciplinary actions taken by the District toward Geer,

and alleged that by his conduct, Geer had demonstrated his inability or unwillingness to exercise sound judgment and behave appropriately.

Based on all these charges, the Board sought Geer's termination.  A hearing on the charges was held over five days in January and February 2016.[7]  Geer was represented by an attorney at the hearing.

On March 29, 2016, hearing officer Trela issued a 42-page decision finding Geer guilty on all five charges, and concluding that termination was the appropriate penalty.  (Dkt. #112-32.) Several salient parts of that decision are worth quoting at some length.

Trela stated that the evidence proved that Geer "has a serious inability to control his anger with his students and his colleagues."  He noted that there had been "a multitude of incidents" involving Geer's anger and inappropriate comments.  Trela wrote that this was "a very sad set of circumstances," because Geer was generally a good teacher, but he added that Geer "has not helped his cause by his actions over the last 10 years, or by his testimony wherein he does **not** take any responsibility for his actions, especially after being given so many chances to improve by the District."  *Id.* at 32.

Trela also stated that "[t]here is nothing in the record to guarantee that [Geer] would not continue" to engage in such behavior, and that "[t]he District has demonstrated that there is no likelihood that [Geer] will be able to control his anger in the future if returned to school and [his] colleagues are extremely fearful of him."  *Id.* at 33.  He continued, "It is very clear that the District has extended much effort, and accommodation in giving [Geer] every opportunity

---

[7] In January 2016, the District and Geer entered into a settlement agreement by which he agreed to resign and release the District from any claims, and the District agreed to withdraw the charges and pay Geer his salary and benefits through the end of the school year.  Geer revoked his acceptance of the agreement within the seven-day revocation period, however.  (Dkt. #112-30.)

possible to guide him towards the path of dealing with his anger issues in hopes that somehow [he] might be able to improve," to no avail.  *Id.*

Trela further stated that "the District has clearly exercised a great deal of restraint by counseling and clearly followed the principles of progressive discipline."  *Id.* at 35.  After reciting the steps taken by the District, in particular Geer's twenty-day suspension and agreement to "see a counselor of his choice," Trela concluded that "[a]fter much counseling and course therapy [Geer] still fails to understand the seriousness of his conduct."  *Id.* at 35, 38.  He stated that at the hearing, Geer "did not concede any wrongdoing or to even maintain [sic] the possibility that his actions might constitute misconduct."  *Id.* at 39.

Trela acknowledged Geer's assertion that he was suffering from PTSD and that he was under the care of both a physician and a therapist.  *Id.* at 21.  He stated that "[i]f indeed [Geer] is receiving some type of medical treatment for PTSD," that was "certainly a good thing," but that "even up until the last day" of the hearing, Geer "remained steadfast that there is nothing wrong with him and the way he has acted."  *Id.* at 34.

Trela also rejected Geer's suggestion that the District should have required him to undergo a medical examination under § 913 of the New York Education Law, which provides that a school district can require an employee to submit to a medical examination "in order to determine the physical or mental capacity of such person to perform his or her duties."  Trela noted that Geer "testified that his own therapist made it clear that [his] actions **are not the result of a medical issue.**"  "Since [Geer's] own therapist has found [him] to be without a medical issue," Trela asked rhetorically, "why would the District then believe that a Section 913 review be appropriate [sic] for [Geer] to undergo?"  *Id.* at 34 (emphasis in original).

With respect to the appropriate penalty, Trela stated that "due to the fact that [Geer] does not understand or believe that he has done anything wrong, the ordering of any type of suspension or remedial assistance would be ineffective to help him."  Though he found this "very regrettable as [Geer] is a good teacher," Trela determined that he "ha[d] no other option but to determine that the ... penalty [of] termination sought by the Board of Education is the only appropriate penalty considering all of the circumstances herein and is ordered."  *Id.* at 40.  He concluded the District had proved Geer's guilt on all five charges, and ruled that the penalty to be imposed on Geer was "termination from his teaching position at the Gates-Chili Central School District."  *Id.* at 42.

Geer then filed a petition in New York State Supreme Court under N.Y. CPLR § 7511, seeking to vacate the hearing officer's findings and recommendations.[8]  On September 21, 2016, Justice Thomas A. Stander issued a decision denying Geer's petition, and confirming the hearing officer's decision.  (Dkt. #112-34 at 5-15.)  An order to that effect was entered on October 11, 2016.  (Dkt. #112-34 at 3-4.)  In his decision, Justice Stander stated that "the Trela Decision and penalty was well supported by the evidence," and that Trela had a rational basis both for his factual findings and for imposing the penalty of termination.  *Id.* at 11-12.

Justice Stander also addressed Geer's arguments based on alleged violations of state and federal statutes prohibiting disability discrimination.  Specifically, Geer alleged "that the District removed and discontinued the reasonable accommodations put in place based on [its] perception

---

[8] Section 3020-a(5) of the Education Law provides that an employee may seek judicial review of a hearing officer's decision pursuant to CPLR § 7511, and that "[t]he court's review shall be limited to the grounds set forth in such section."  Under § 7511, "an award may be vacated only if (1) the rights of a party were prejudiced by corruption, fraud or misconduct in procuring the award, or by the partiality of the arbitrator; (2) the arbitrator exceeded his or her power or failed to make a final and definite award; or (3) the arbitration suffered from an unwaived procedural defect."  *Hackett v. Milbank, Tweed, Hadley & McCloy*, 86 N.Y.2d 146, 154-55 (1995).

of [Geer] as disabled." *Id.* at 12.  Upholding Trela's findings, the court stated, "There is nothing

in the record, other than self-serving conclusory statements by the Petitioner Geer, that he

suffered from post traumatic stress disorder," and "nothing indicating that Petitioner suffered

from a diagnosed disability." *Id.* at 13-14.

Plaintiff commenced this action on March 15, 2017, and filed an amended complaint on

May 31, 2017.  The amended complaint (Dkt. #8) asserted eight causes of action:  (1) an ADA

claim against the District and (2) an analogous claim under the NY HRL; (3) a claim of

intentional infliction of emotional distress against the District, EHS, DiMaria and Buckshaw;

(4) a claim of fraudulent misrepresentation against the District, EHS, and the Board; (5) a § 1983

claim for violation of his First Amendment rights to free speech and free association, against

Buckshaw, Ward, the District and the Board; (6) a § 1983 due process claim against the District,

the Board, Buckshaw and Ward; (7) a claim under § 1983 and the ADA for disability

discrimination against the District and the Board; and (8) a claim against the District and the

Board for negligent retention and supervision of Buckshaw.

The claims against EHS and DiMaria were based on DiMaria's having testified at the

3020-a hearing.  As noted above, those claims have been dismissed.  In addition, plaintiff has

withdrawn his claims for intentional infliction of emotional distress (claim 3), fraudulent

misrepresentation (claim 4), and due process (claim 6).  *See* Plaintiff's Response to Defendants'

Motion (Dkt. #118) at 1.

Plaintiff states that he is also withdrawing his claim for breach of contract, which is

contained only in his proposed second amended complaint.  *See* Dkt. #37-1 at 36; Dkt. #118 at 6.

As stated, the Court denied plaintiff's motion to file a second amended complaint on July 25,

2018, and that decision has been affirmed by the Second Circuit.  There is no such claim to withdraw, then.

Plaintiff also asks the Court to "hold in abeyance" claims 8 and 9.  Claim 9 is also contained only in the proposed second amended complaint, so there is nothing to "hold in abeyance."

As to Claim 8 (negligent retention and supervision), it appears that plaintiff's request to hold the claim in abeyance was intended to mean that he was not seeking summary judgment or seeking any ruling by the Court on that claim.  At oral argument on the parties' motions, however, counsel for plaintiff stated that in light of defendants' having moved for summary judgment on all of plaintiff's claims, plaintiff now asks the Court to grant summary judgment in his favor on all the remaining claims, including Claim 8.

What is now before the Court, then, are three claims:  plaintiff's claims for disability discrimination under the ADA, HRL, and § 1983; a First Amendment claim under § 1983; and his claim for negligent retention and supervision of Buckshaw.


## DISCUSSION

### I. Timeliness and the Effect of the May 2015 Settlement Agreement

Before turning to the merits of plaintiff's claims, it is necessary to address two matters relating to whether and to what extent plaintiff is barred from asserting his claims.  The first relates to the effect of the parties' settlement agreement that they entered into in May 2015.  In that agreement, Geer expressly released the District and all its officers, employees, etc. "from any and all claims ... which Geer now has or may have against the released parties arising out of

employment or the execution of this agreement ... ."  Settlement Agreement (Dkt. #125-25) at 4 ¶ 19.  The release also stated that Geer "agrees not to prosecute or pursue any claim against the District that this Release purports to cover," but that the release was "not a release of future rights or claims that may arise after termination."  *Id.* at 5 ¶ 19.  In effect, then, Geer agreed that he would never bring any claim against the District or its employees that he had or may have had as of the date of execution of the agreement.  Defendants contend that in light of the settlement agreement, Geer cannot rely on events that predated that agreement.

Defendants also contend that plaintiff's claims are time-barred to the extent that they are based on events that occurred more than 300 days before plaintiff filed his administrative complaint with the Equal Employment Opportunity Commission ("EEOC") on April 25, 2016. Under the ADA, which incorporates the filing procedures of Title VII of the Civil Rights Act of 1964, as a prerequisite to suit a plaintiff must file a charge with the EEOC or analogous state agency within 300 days of the alleged act of discrimination.  *See* 29 U.S.C. § 626(d); 42 U.S.C. § 12117(a).  Claims based on acts that occurred more than 300 days before the plaintiff filed an administrative charge are time-barred.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Kuperman v. City of New York*, No. 20-CV-6834, at *3 (S.D.N.Y. Sept. 28, 2021). Defendants argue that this bars plaintiff's claims arising out of events that occurred before June 30, 2015.

With respect to the settlement agreement, plaintiff responds that he "is not bringing claims for discrete acts that occurred prior to June 2015."  Plaintiff's Response (Dkt. #118) at 19. His attorney repeated that at oral argument, stating that he was only relying on events predating the settlement agreement as "background information."  Similarly, he states that his "lawsuit

does not seek damages for ... discrete violations of the ADA occurring prior to June 30, 2015, but rather raises those issues to demonstrate that Defendants' alleged legitimate, nondiscriminatory reasons for discharge were merely pretexts for his April 6, 2016 termination, and to support his claim of discriminatory discharge."  Plaintiff's Response at 18.

Although Geer's termination occurred after the execution of the settlement agreement, and less than 300 days before he filed his EEOC complaint, as the above recitation of the facts makes clear, it was also the culmination of a long series of events.  Many of those events predated the agreement and occurred more than 300 days before the filing of the administrative charge.  Defendants themselves rely on the events leading up to the settlement agreement, to support their argument that they terminated Geer because of his history of unacceptable behavior.  Since both sides agree that prior acts are relevant to plaintiff's claims, the Court will consider such evidence, with the understanding that plaintiff may not rely on it as a direct basis for his claims.[9]  *See Kuperman*, 2021 WL 4442855, at *3 (time-barred discrete actions "may still be introduced as background evidence in support of a timely claim") (citing *Morgan*, 536 U.S. at 113); *accord Cristofaro v. Lake Shore Cent. Sch. Dist.*, No. 06-CV-487, 2011 WL 635263, at *8 (W.D.N.Y. Feb. 11, 2011).

Although it is Geer who urges the Court to consider all the events preceding the EEOC filing, defendants suffer no prejudice whatsoever.  In fact, defendants also rely on those facts and others to show the numerous incidents of Geer's misconduct, occurring over many months, that eventually led to his termination in 2016.

_____

[9] In his responding brief, plaintiff also states that "Defendants have failed to prove that this Agreement was properly executed," because it was signed by Ward, rather than by the members of the Board of Education.  (Dkt. #118 at 25.)  Plaintiff does not appear to press this argument, however, and I find it meritless.  There is no dispute that both sides agreed to the settlement.

**II. Preclusive Effect of the Education Law 3020-a Decision by Hearing Officer John Trela**

Another threshold issue concerns whether the Court should give any preclusive effect to the hearing officer's decision in the 3020-a proceeding, and the state court's ruling confirming that decision.  Defendants contend that the hearing officer's factual findings are entitled to preclusive effect, at least insofar as he found that the District had legitimate reasons for terminating Geer.  Plaintiff argues that the 3020-a hearing and the ensuing Article 75 proceeding addressed a narrow, discrete set of issues that are different from those at issue here, and that the findings and conclusions by Trela and Justice Stander are therefore entitled to no preclusive effect in this case.

Federal courts in this circuit "generally give preclusive effect to a state agency's administrative findings if the state's courts would do the same." *Ferraro v. N.Y.C. Dep't of Educ.*, 752 F.App'x 70, 73 (2d Cir. 2018) (citing *Burkybile v. Bd. of Educ. of Hastings-On-Hudson*, 411 F.3d 306, 311-12 (2d Cir. 2005)).  As the Court of Appeals for the Second Circuit has observed, "New York courts afford preclusive effect to 'administrative determinations ... if made in a quasi-judicial capacity and with a full and fair opportunity to litigate the issue.'" *Ferraro*, 752 F.App'x at 73 (quoting *Burkybile*, 411 F.3d at 312).  Because 3020-a proceedings satisfy these requirements, federal courts are to "give them preclusive effect as to most claims.  However, as to certain federal civil rights claims, including those brought under Title VII and the ADA, there is an additional prerequisite:  [courts] give preclusive effect only to a state agency's findings that have been judicially reviewed." *Ferraro*, 752 F.App'x at 73 (citations omitted).

-27-

"In addition, for findings from a 3020-a proceeding to preclude re-litigation of an issue, 'the issue must have been material to the ... proceeding and essential to the decision rendered therein.'" *Ferraro*, 752 F.App'x at 73 (quoting *Burkybile*, 411 F.3d at 313) (additional internal quote omitted).  In *Ferraro*, for example, the plaintiff, who had been terminated from his teaching job for misconduct, had raised defenses of disability discrimination and retaliation in his 3020-a proceeding.  The hearing officer considered and addressed those defenses, but found that the record did not support them.  The Second Circuit in *Ferraro* ruled that "the issues were sufficiently litigated and essential to warrant preclusive effect."  752 F.App'x at 74.  *See also Mazur v. N.Y.C. Dep' of Educ.*, 621 F.App'x 88, 89 (2d Cir. 2015) ("Absent evidence sufficient to support a reasonable finding of discriminatory motivation [which the court found was lacking] we must accept the hearing officer's determination that Mazur was guilty of the charged conduct and disciplined for these legitimate reasons").

Although on the surface the parties in the instant case appear to dispute this issue, they are actually largely in agreement.  Defendants state that they do not argue that the 3020-a or Article 78 proceedings bar plaintiff's claim of discrimination.  They only argue that plaintiff is precluded from litigating the issue of whether defendants had a legitimate reason for disciplining and ultimately terminating him based on his misconduct.  *See* Def. Reply Mem. (Dkt. #119) at 20.  Plaintiff argues that neither hearing officer Trela nor Justice Stander had jurisdiction to decide Geer's discrimination claims, and that they did not purport to decide such claims.

Both sides appear to agree, then, that plaintiff's *claims* in this action, particularly his disability-related claims, are not barred.  Although both Trela and Justice Stander concluded that the evidence did not support Geer's assertion that he suffered from a disability, it is at least

questionable whether issues related to Geer's alleged disability were so fully, fairly and necessarily litigated in the state proceedings that they should be given preclusive effect in this action.  The focus of the 3020-a hearing and the Article 78 proceeding was on whether Geer had engaged in misconduct and if so, whether that misconduct warranted his termination.  Matters concerning his claims of disability appear to have been of secondary concern.  *See Washington v. N.Y.C. Dep't of Educ.*, No. 16 Civ. 9588, 2017 WL 4687982, at *7 (Oct. 16, 2017) ("The Second Circuit has held that a finding of just cause for termination or discipline resulting from a § 3020-a hearing does not necessarily preclude the possibility that her termination was 'motivated by unlawful animus'") (quoting *Leon v. New York City Dep't of Educ.*, 612 F.App'x 632, 634 (2d Cir. 2015)); *Williams v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 8518, 2013 WL 5226564, at *9 (S.D.N.Y. Sept. 17, 2013) (hearing officer's finding that plaintiff had committed certain infractions did "not affect the plaintiff's ability to argue [in her lawsuit] that the charges themselves–even if meritorious–were brought with improper motives").

That does not mean, however, that the Court should not give preclusive effect to some of the *factual* findings of the hearing officer and the state court.  Whether Geer engaged in misconduct, and whether defendants had a legitimate reason for seeking his termination, was at the heart of the 3020-a proceeding, and Trela, after a full hearing, made extensive and explicit findings in that regard.  He found that Geer had repeatedly behaved inappropriately toward both coworkers and students, that Geer did not acknowledge that he had done anything wrong, that the District had given him many opportunities to correct those problems, and that there was ample justification for his termination.  In Geer's Article 78 proceeding, the state court said that those findings were "well supported by the evidence."  Since all of those matters were fully,

fairly, and necessarily litigated, this Court gives preclusive effect to the findings of the hearing

officer and the state court that Geer was guilty of misconduct warranting his termination. *See*

*Severin v. N.Y.C. Dep't of Educ.*, No. 19-cv-775, 2021 WL 1226995, at *7 (S.D.N.Y. Mar. 31,

2021) (accepting findings of hearing officers that plaintiff engaged in misconduct, but stating

that those findings "do not decisively prove that Defendants would have taken the same actions

regardless of Plaintiff's allegedly protected speech"); *Thomas v. Town of Southeast*, 336

F.Supp.3d 317, 325-26 (S.D.N.Y. 2018) (stating that "Plaintiff rightly contends that the fact that

the Hearing Officer recommended that Plaintiff be terminated based on the disciplinary charges

does not preclude this court from finding that he was terminated in retaliation for opposing

unlawful discrimination," but that "[n]evertheless, this Court may give preclusive effect to the

factual findings of the Section 75 Hearing Officer, insofar as such findings preclude Plaintiff

from arguing facts to the contrary"). As explained, that does not preclude Geer from asserting in

this action that his termination was nonetheless unlawful because it was motivated by

discriminatory or retaliatory animus or that defendants failed to provide him with a reasonable

accommodation for his alleged disability.[10]

---

[10] Arguably, plaintiff's disability claims *were* raised, litigated, and decided adversely to him in the administrative and state court proceedings. Justice Stander's decision addressed the matter at some length and found no basis for a claim that Geer suffered from a disability or that the ADA prohibited the penalty imposed by Trela. *See* Dkt. #112-34 at 12-14. But since defendants here do not rely on the doctrine of claim preclusion, the Court will not reach that issue, and will limit the present discussion to issue preclusion, *i.e.*, whether plaintiff is precluded from relitigating the underlying facts.

### III. Disability Discrimination

#### A. General Principles

In his first, second and seventh causes of action, plaintiff asserts claims of disability discrimination.  The first claim is brought under the ADA, the second under the HRL, and the seventh under the ADA and § 1983.

Before addressing these claims in detail, I note that to the extent that plaintiff asserts such claims under 42 U.S.C. § 1983, such claims must be dismissed.  Section 1983 provides a right of action for a violation of rights protected under the Constitution, not rights conferred by statute. The United States Constitution does not guarantee a right to be free from discrimination based on one's disability.  *See Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 368 (2001) ("If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause"); *Consiglio v. N.Y.S. Civil Service Comm'n*, No. 19-CV-1080, 2021 WL 2115302, at *4 (N.D.N.Y. May 25, 2021) ("A claim of disability discrimination is not actionable under section 1983"); *Bonds v. County of Westchester*, No. 19-CV-1712, 2020 WL 4347704, at *8 (S.D.N.Y. July 28, 2020) ("the weight of authority in the Second Circuit establishes that claims of employment discrimination based on disability are not cognizable under § 1983").

Rights of disabled persons are protected by the ADA, and by the analogous provisions of the HRL.  Claims under those statutes are generally governed by the same standards, *see Cady v. Bolivar-Richburg Central Sch. Dist.*, No. 12-CV-1121, 2016 WL 8291111, at *13 (W.D.N.Y. Nov. 28, 2016) (*citing Noll v. I.B.M. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015), and accordingly will be addressed together in this Decision and Order.

-31-

Plaintiff also asserts two different types of disability-related claims.  He alleges both that defendants discriminated against him, *i.e.*, took some actions against him, because of his actual or perceived disability, and that they failed to offer him a reasonable accommodation for his disability.  Although related, these are conceptually different claims.  The evidence shows that neither claim has merit.

The ADA prohibits an employer from discriminating against any "qualified individual on the basis of disability in regard to ... the ... discharge of employees" or any other "terms, conditions, and privileges of employment."  42 U.S.C. § 12112((a).  The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

Discrimination claims under the ADA are subject to the burden-shifting analysis articulated in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, plaintiff must establish a prima facie case of discrimination by demonstrating:  (1) that he was disabled within the meaning of the ADA, or perceived by his employer to be so; (2) that he was "otherwise qualified" to perform the requirements of his position, with or without reasonable accommodation; and (3) that he suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination.  *See Cortex v. MTA N.Y. City Transit*, 802 F.3d 226, 231 (2d Cir. 2015); *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96-97 (2d Cir. 2009).

Once the plaintiff has made out a prima facie case, the employer must present evidence that it had a legitimate, non-discriminatory reason for the adverse action.  The burden then shifts

-32-

back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination. *Van Ever-Ford v. Office of Mental Health*, No. 13-CV-412, 2020 WL 5951334, at \*9 (W.D.N.Y. Oct. 8, 2020) (citing *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).

To meet that burden, the plaintiff must show not just that a discriminatory motive played some part in the employer's decision, but that it was a "but-for cause" of the challenged employment action. *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019). The plaintiff need not show that unlawful discriminatory animus was the *sole* cause of the action, but he must establish that the adverse action would not have been taken absent a discriminatory motive. *See Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 n. 5 (2d Cir. 2013).

In contrast, a claim based on an alleged failure to accommodate a disability does not require a discriminatory motive. To survive summary judgment on a failure-to-accommodate claim, the plaintiff must present evidence demonstrating that "(1) he is disabled within the meaning of the ADA; (2) his employer is a covered entity; (3) he could perform the essential functions of his job with an accommodation; and (4) the defendants refused to provide such an accommodation despite being on notice." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019). *Accord Trahan v. Wayfair Maine, LLC*, 957 F.3d 54, 65 (1st Cir. 2020); *Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014).

A plaintiff may bring ADA claims under both theories. "In discrimination claims based both on adverse employment actions and on failures to accommodate, the plaintiff 'bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment.'" *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013) (quoting *McBride*, 583 F.3d at 97. "Additionally,

'plaintiff [also] must show the *connections* between (1) the failure to accommodate a disability, (2) the performance deficiencies [that were the ostensible cause for the adverse action], and (3) the adverse employment action.'"  *Piligian v. Ichan School of Medicine*, 490 F.Supp.3d 707 (S.D.N.Y. 2020) (quoting *Natofsky*, 921 F.3d at 352) (additional internal quote omitted).

### B. Application to this Case

In the case at bar, Geer has alleged both that defendants discriminated against him because of his actual or perceived disabilities, and that they failed to offer him a reasonable accommodation.  The amended complaint alleges that defendants "discipline[d Geer] for manifestations of what they believed to be his disabilities," that they "imposed disparate disciplinary penalties" on him, that they "constructed a disciplinary record whose purpose it was to justify [his] discharge based on their perceptions of Plaintiff 'as disabled,'" and that they engaged in "intentional discriminatory acts" against him.  (Dkt. #8 ¶¶ 169, 170, 172, 229.)

Geer also alleges that, at least while Iuppa was principal, the District provided Geer with "reasonable accommodations intended to assist [him] in meeting the essential functions of his position," but that when Buckshaw replaced Iuppa, she unilaterally discontinued those measures. *Id.* ¶¶ 164, 168.  In his memorandum of law, plaintiff also relies on both theories.  His claim is that defendants' discontinuance of what he describes as a reasonable accommodation, and refusal to reinstate those measures, were part and parcel of their discriminatory actions toward him. According to plaintiff, defendants' cessation of those measures led him to engage in the behaviors that paved the way for his discharge.  Although conceptually separate, then, the two theories are intertwined in this case.

At least for purposes of the present motions, defendants do not appear to assert that at the time of the relevant events, Geer did not have a disability.  In other words, while defendants do not concede that Geer *did* have a disability, whether he did or did not have a disability is not crucial to their arguments.

As explained below, I also find it unnecessary for the Court to reach that question. Plaintiff has presented some evidence that he suffered from PTSD and other psychiatric conditions, *see*, *e.g.*, Report of Evelyn M. Coggins, MD (Dkt. #113-16), and I will proceed on the assumption that he has cleared that hurdle, at least at the summary judgment stage.

The first issue to be addressed with respect to this claim, then, is whether plaintiff has presented sufficient evidence that he could have performed his job satisfactorily with a reasonable accommodation, and that defendants denied him such an accommodation.  In that regard, the threshold question is whether plaintiff has identified any reasonable accommodation at all.  The proof shows that Geer never did identify an accommodation.

Geer asserts that prior to Iuppa's retirement, he was provided with accommodations, which were later discontinued, but the evidence demonstrates that none of the measures taken were truly "accommodations" granted to him, but rather that they were all disciplinary measures imposed upon him.  In support of his claim, Geer points to the provisions of the Corrective Action Plan, including keeping a journal and meeting on a regular basis with Iuppa.  Geer also cites his participation in a Therapeutic Crisis Intervention ("TCI") course (at Iuppa's direction) as another example of a reasonable accommodation.  He claims, in general, that the steps undertaken while Iuppa was principal enabled Geer to maintain his self-control and avoid engaging in the kinds of behaviors that got him into trouble.

There are several problems with this assertion.  The first is plaintiff's characterization of the measures taken by Iuppa as "accommodations" for plaintiff's disability.  In that regard, the CAP and the TCI course must be viewed in the context of the entire course of events, from the first counseling memorandum issued to Geer in 2006 to his termination in 2016.  Seen against that backdrop, both the CAP and the TCI course did not represent an accommodation, but were intermediate steps in a ten-year period of progressive discipline, leading to the ultimate sanction of discharge from employment.  Geer never requested these actions; they were imposed upon him as discipline.

Iuppa himself saw these measures as such, contrary to plaintiff's portrayal of Iuppa's retirement and replacement by Buckshaw as a watershed moment, when there was an abrupt shift from accommodation to punishment.  In his written statement directing Geer to take the TCI course, Iuppa said that he was giving Geer "one last opportunity to address his anger" issues.  He also explicitly "ma[d]e it clear ... that there is no room for another angry and belittling outburst toward a student or staff member *without a series of escalating disciplinary actions* being brought by the school district, up to and including ...suspension from his duties as a teacher."

Although Iuppa acknowledged that Geer had good qualities as a teacher, he was obviously increasingly frustrated by Geer's continual misbehavior.  Indeed, Iuppa testified at his deposition that he "was frustrated that [he] would have a guy [Geer] that did wonderful things," but who "every once in a while ... went off in an extreme fashion."  (Dkt. #113-14 at 54.) Plainly, by the time of his retirement, Iuppa had ceased to view Geer's outbursts as "anomalies," as he had described the first such incident in 2006, but as part of an entrenched pattern of serious misconduct with no end in sight.

Tellingly, when Geer's problems continued after the CAP came to an end, Iuppa's response was not to implement a new CAP along similar lines as the first, but to try a different tack–the TCI course–coupled with a stern warning that if the problems continued, the discipline would increase in severity.  This was a matter of discipline, not an accommodation requested by Geer.  By the time he left, then, Iuppa plainly did not see the situation as one that called for "accommodating" Geer's issues, but as an intractable problem.[11]

That is not to say that at every step of the process, defendants simply punished Geer for his misbehavior.  By its very title, the CAP was intended to be "corrective."  Likewise, the TCI course was by definition supposed to be "therapeutic," and Iuppa testified that he told Geer to prepare a written synopsis of what he learned in the class because Iuppa "wanted to make sure that [Geer] participated fully in that class, and that he was sincere about it, and that he got something out of it."  (Dkt. #113-14 at 52.)

Without question, there was some remedial intent throughout this process, particularly early on.  But as Geer's inappropriate behavior continued, the measures took on a more punitive aspect.  There is no indication, however, that they were ever intended to be simply an "accommodation" in the sense that defendants would continue to tolerate Geer's misbehavior as long as he outwardly complied with certain directives, such as keeping a journal.  Just because Geer now chooses to describe the imposed requests as an "accommodation" does not make it so. The requirements imposed on Geer, whether seen as disciplinary, remedial, or otherwise, were

---

[11] When asked at his deposition whether at the time of his retirement he thought that Geer "had effectively dealt with his problems" Iuppa stated that he "was hopeful," but that he "didn't know for sure."  (Dkt. #113-14 at 62.)

never meant to be an end in themselves, then, but only a means to an end:  improved behavior on

Geer's part.  That never occurred.

In addition, some of the measures called for under the CAP, such as keeping a journal

and seeking counseling, did not require *any* action on the part of the District.  In the CAP, Geer

stated that he "had already started taking action" to address his problems.  He said that his doctor

had prescribed "an increased dose of anti-depressants" and that he was currently seeing a

counselor.  He wrote that it was his "plan to continue in counseling to help relieve the symptoms

of PTSD and panic disease," and that he was "learning strategies to deal with [his] frustration

and anger."  (Dkt. #112-12 at 2.)  At his deposition on July 17, 2020, Geer testified that he was

continuing to see his therapist.  Geer Depo. Tr. at 81.

As a practical matter, then, the only thing that truly seems to have come to an end upon

Iuppa's retirement was Geer's regular meetings with Iuppa.  There was nothing defendants could

do about that, since Iuppa no longer worked at the school.  One obvious substitute–regular

meetings with Iuppa's replacement, Buckshaw–was just as obviously out of the question,

considering their less than cordial relationship.  By his own admission, Geer had opposed

Buckshaw's hiring in the first place, and he certainly had not developed any rapport with her

since then.

That leads to another critical flaw in plaintiff's claim, which is that following Iuppa's

retirement, Geer *never* requested any of the so-called "accommodations" that he now asserts the

District should have provided to him.  At his deposition, Geer was asked, "Did you ever speak to

anyone at the district about a different accommodation after Mr. Iuppa's retirement?," and he

answered, "No."  (Dkt. #112-4 at 42.)  When asked why, Geer replied that he thought that "if

[he] discussed it with certain people, it could end up coming back to haunt" him, that he "just didn't really know ... who to contact about that," and he "was fairly ignorant of certain processes." *Id.* at 44.

"Generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Jones v. N.Y.C. Transit Auth.*, 838 F.App'x 642, 644 (2d Cir. 2021) (quoting *Costabile v. N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2020)).  If the employee fails to do so, that will typically defeat an ADA claim, since an employer cannot fairly be said to have denied the employee a reasonable accommodation if none was ever requested, or if the employer had no reason to think that some accommodation was called for.  *See*, *e.g.*, *Dooley v. JetBlue Airways Corp.*, 636 F.App'x 16, 18-19 (2d Cir. 2015) (finding that the plaintiff could not establish the "fourth prong" of the failure-to-accommodate test because she did not allege that she had ever requested the accommodation at issue, and noting that "an employer cannot 'refuse [ ] to make [an] accommodation' ... that it was never asked to make") (quoting *McMillan v. City of New York*, 711 F.3d 120, 126 (2013)); *Johnson v. L'Oréal USA*, No. 18 Civ. 9786, 2021 WL 4482167, at *16 (S.D.N.Y. Sept. 30, 2021) (granting summary judgment for employer where plaintiff "never asked ... for any help or for any accommodation"); *Dolac v. County of Erie*, No. 17-CV-1214, 2018 WL 10780484, at *6 (W.D.N.Y. Sept. 28, 2018) ("plaintiff concedes that she did not request a reasonable accommodation from her employer"), *R&R adopted*, 2020 WL 2840071 (W.D.N.Y. June 1, 2020).

It is undisputed that Geer did not request that defendants take any particular actions at any time, whether they could be viewed as "accommodations" or otherwise.  His usual response

following an incident was to deny that he had done anything wrong, and to shift the blame to others, whether students or coworkers.  Outwardly, he did not seem to think that he needed or wanted any help.[12]  The failure to request an accommodation defeats Geer's ADA claim in this case.

The Second Circuit has carved out a very limited exception to the general rule where "the disability is obvious–which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008).  In that event, the employer "has a duty reasonably to accommodate an employee's disability" even if the employee does not ask for an accommodation." *Id.*  The purpose of this rule is to deal with situations in which "an employer perceives an employee to be disabled but the employee does not so perceive himself ... .  In such situations, the disability is obviously known to the employer, while the employee, because he does not consider himself to be disabled, is in no position to ask for an accommodation." *Id.*  When an employer is on notice of such a disability, it must "engage in an interactive process" with the employee and "work together to assess whether [the] employee's disability can be reasonably accommodated." *Id.* (internal quotation marks omitted).  But that is not the case here.

In the case at bar, Geer contends that he fell within this exception.  In support of that contention, he cites several points in the record in which there are references to his suffering from PTSD and seeking therapy.  He asserts that defendants therefore should have known that he suffered from disabling psychological problems.

---

[12] As noted earlier, Geer did state at one point that on his own initiative, he had begun undergoing counseling and seeking medical care, but again, the fact that he had done so without any involvement on defendants' part demonstrates that he was not asking them to provide him with any accommodation in that regard.

Leaving aside the question of whether Geer was in fact suffering from a disability, those few scattered references are insufficient to create a genuine issue of fact concerning whether defendants knew or should have known that he was disabled or that he needed some "accommodation" to enable him to carry out his job duties.  Where courts have found sufficient evidence to support such a finding, the disabling condition was indisputably obvious or known to the employer.  In *Brady*, for example, the plaintiff had cerebral palsy, which he and other witnesses testified affected "everything" he did.  As one witness put it, "[j]ust by looking at him, you could tell he had a disability."  *Id.* at 130.

Although a psychological or behavioral condition will often not be as immediately apparent as a physical condition, it must still be either known to the employer or so obvious that the employer's knowledge can be inferred.  *See*, *e.g.*, *Robles v. Medisys Health Network, Inc.*, No. 19-cv-6651, 2020 WL 3403191, at *11 (E.D.N.Y. June 19, 2020) (where plaintiff "suffered a mental breakdown and was found lying in the street," and was taken by ambulance to the very hospital where he worked, hospital knew or should have known that he suffered from a disability).

While I do not mean to suggest that plaintiff's symptoms of his alleged disability must have been as severe as the plaintiff's in *Robles* for him to have a viable claim, the facts here simply do not support plaintiff's allegation that his alleged disability was obvious to defendants, thereby triggering their obligation to engage him in an interactive process.  That is particularly so because they had tried various measures to correct Geer's misbehavior, without success.  As far as defendants could tell, they were simply dealing with an employee who could not or would not control his temper, and who neither wanted nor responded to corrective measures.

-41-

Even if defendants had or should have had some inkling that Geer was suffering from mental health problems, he has not articulated what they should have done differently.  At his deposition, Geer was asked what, in hindsight, he thought the District should have done for him after Iuppa left, and he was unable to come up with anything other than "the ability to be able to still have counseling and, you know, have someone that basically had a sympathetic ear over that."  (Dkt. #112-3 at 35.)  When asked if by "someone" he meant one of his supervisors, he answered, "Yes."  *Id.* at 36.

Essentially, Geer wanted a supervisor with whom he got along better.  Presumably, he would also have liked coworkers with whom he was more compatible as well.  But his repeated confrontations with different coworkers and students, despite disciplinary and attempted corrective measures, were precisely the problem.  The common factor in all of those incidents was Geer.  Replacing his supervisor and coworkers with persons more to his liking was hardly a realistic or reasonable accommodation, and certainly not one that Geer requested.

It is important to note that plaintiff could not reasonably have expected defendants simply to be more tolerant of his blowups, or to demand that his coworkers and students do so. "Requiring others to tolerate misconduct ... is not the kind of accommodation contemplated by the ADA." *McElwee v. County of Orange*, 700 F.3d 635, 645 (2d Cir. 2012).  That is particularly true when the misconduct may pose a danger to others.  *See Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 172 (2d Cir. 2006) ("this Court, like every other court to have taken up this issue, does not read the ADA to require that employers countenance dangerous misconduct, *even if that misconduct is the result of a disability*") (emphasis added); *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290-91 (11th Cir. 2002) (holding that an employee's "inability to

work with others ... insubordination, and threats of violence" rendered her not "otherwise qualified" within the meaning of the ADA).

Although Geer denies that he posed a danger to anyone, he certainly was known to act at times in an aggressive, hostile manner, sometimes closely approaching the target of his tirade, face to face. More than one witness described his behavior as "intense" on these occasions, on one of which he left a student visibly crying and shaking. Geer's alleged statements about "burying" White and "knocking him out," and his boast that he could easily "kick [White's] ass" also had obviously threatening overtones. In light of those facts, it was hardly unreasonable for defendants to be concerned that sooner or later one of Geer's outbursts would cross the line into physical violence, and they need not have waited for that to happen before taking action.

That Geer's misbehavior may have been the result of PTSD or some other mental or psychological problem is of no moment. "[W]orkplace misconduct is a legitimate and nondiscriminatory reason for terminating employment, even when such misconduct is related to a disability." *McElwee*, 700 F.3d at 641; *see also Todd v. Fayette County Sch. Dist.*, 998 F.3d 1203, 1217 (11th Cir. 2021) (school district "acted within its rights to eliminate that [threatening] behavior from [the school where plaintiff taught], especially since Todd's job required that she be responsible for the welfare of her students"); *Hannah P. v. Coats*, 916 F.3d 327, 341 (4th Cir. 2019) ("[T]he ADA does not require an employer to simply ignore an employee's blatant and persistent misconduct, even where that behavior is potentially tied to a medical condition") (citation omitted); *Johnson*, 2021 WL 4482167, at *15 ("even if Johnson's depression contributed to her actions, that does not shield her from termination"). Of course, as mentioned above the findings made at the § 3020-a hearing, as confirmed by Justice Stander, must be given

-43-

preclusive effect in establishing the District's legitimate reason and cause for Geer's termination and guilt on all of the five allegations lodged against him. This proceeding in federal court does not provide Geer with yet another opportunity to challenge those factual determinations.

As the First Circuit has observed, an employee's plea for forgiveness or for a second chance "should not be viewed as an accommodation proposal at all," and "[n]othing in the ADA demands that an employer accord an employee–even an employee with a disability–such a second chance." *Trahan v. Wayfair Maine, LLC*, 957 F.3d 54, 65, 66 (1st Cir. 2020). Here, of course, Geer did not even ask for forgiveness, since he generally denied having done anything wrong in the first place, and he *was* given a second chance and then some. To say that Geer was given a "second chance" is a gross understatement. Over several months, he was given numerous letters, warnings, and disciplinary actions, including suspension and removal of his teaching responsibilities. Geer was warned time and time again that there could be more serious discipline if he did not rectify his behavior. He failed to do so. The district was not obligated to give him an endless series of "chances," which would effectively have meant simply overlooking or tolerating his misbehavior. That is not what the ADA requires.

It is also worth noting that although plaintiff characterizes his talks with Iuppa as "counseling" sessions, Iuppa himself did not see them that way. Iuppa testified that although he thought of Geer as a friend, "in working with him, I was in a relationship as his principal. I wasn't his therapist. I was supervising the guy who worked for me in the way that I would anybody that worked for me." (Dkt. #112-8 at 18.)[13]

---

[13] Iuppa also stated, "The purpose of meeting with Mr. Geer month to month was just to check in and find out, from his perception, how he was doing." (Dkt. #112-8 at 15.) He stated that he "applauded [Geer's] efforts and encouraged the things he was doing" to correct his problems, *id.*, but clearly he did not consider himself to be acting in a therapeutic role.

As far as Iuppa and other District officials were concerned, then, Geer had not been receiving counseling from Iuppa, but had been engaged in a process that was intended to bring an end to his misbehavior.  It was discipline.  Following Iuppa's retirement, defendants did not unilaterally withdraw a previously-provided accommodation; they *continued* the disciplinary process that had begun under Iuppa.

Furthermore, defendants did nothing to prevent Geer from receiving counseling.  He testified at his deposition that, as he stated in the EAP, on his own initiative he had begun seeing an outside therapist, Bonnie Maute, who was a licensed clinical social worker.  He testified that at the time of his deposition, he was continuing to see her, as often as he felt circumstances warranted.  (Dkt. #112-4 at 81.)  In addition, Ward expressly told Geer in May 8, 2014 letter that "the EAP ... is free to you, anonymous and confidential should you be in any need of future assistance and or counseling."  *Id.*  Geer did not avail himself of that offer, nor did he ever suggest to defendants that his going back to the EAP, or retaking the TCI course (which he said he had found "useful," Dkt. #112-4 at 48), might help him bring his behavior under control.  He requested no "accommodation."

Far from terminating Geer because his alleged disability, or refusing to provide a reasonable accommodation to enable him to continue working, defendants made repeated efforts to rectify the problems caused by his misbehavior, albeit without success.  Those efforts began with simple warnings, and progressed to relatively moderate remedial measures.  As each of these efforts proved fruitless, defendants' responses to Geer's flareups became increasingly stringent and took on a decidedly disciplinary cast, albeit with no more success than before.

-45-

That defendants ultimately decided to terminate Geer's employment is not indicative of animus, but merely defendants' reasonable and justifiable conclusion that they had run out of options.

## IV. First Amendment Claim

In his fifth cause of action, which is brought against the District, the Board, Ward and Buckshaw, Geer asserts that defendants violated his rights under the First Amendment to the United States Constitution.

As pleaded, it is ambiguous as to what the factual basis for this claim is. In his factual allegations, plaintiff alleges that he opposed Buckshaw's hiring as assistant principal at Gates Chili Middle School. He asserts that his "verbalization of his concerns" about Buckshaw were protected by the First Amendment, and that defendants sought to retaliate against him for expressing those concerns. *See* Amended Complaint ¶¶ 91-93, 101, 133. But, in his separately set out fifth cause of action, which is the only one that explicitly asserts a First Amendment claim, plaintiff makes no mention of his alleged opposition to Buckshaw's hiring. Instead, he alleges that Buckshaw and Ward violated his First Amendment rights to free speech and free association by ordering him "to not discuss a matter relating to pending disciplinary action which resulted from an incident occurring during the summer of 2014." *Id.* ¶ 196.

The complaint alleges that "[a]fter briefly raising the issue three months later with two co-workers who [ ] had witnessed the incident, Plaintiff was suspended from his teaching duties for the entire 2014-2015 academic year, with the exception of the first three weeks of September." *Id.* ¶ 197. That appears to be a reference to plaintiff's allegation elsewhere in the complaint that he was suspended for "virtually the entire *2013-2014* school year" because of his

"five minute conversation with co-workers for mutual aid and protection ... ." *Id.* ¶ 140 (emphasis added). That cryptic statement presumably alludes to Geer's approaching Mary Jane Brennan and Kathy White in September 2013, to talk to them about his prior confrontation with Chad White in June 2013.[14]

It appears, then, that the statement that plaintiff was suspended for the 2014-2015 academic year is a typographical error. There is no dispute that Geer was placed on paid administrative leave for the bulk of the 2013-2014 year, in part because of his confrontation with Chad White in June 2013, and his statements to Brennan and Kathy White about that confrontation. Geer accepted a 20-day suspension in May 2015, but that was due to his altercations with students, not to any allegedly protected speech.

In his fifth cause of action, plaintiff also asserts that Buckshaw violated his "right of association by ordering Plaintiff not to attend school events such as High School graduation" and school dances. *Id.* ¶ 202. The complaint alleges that defendants thereby "deprive[d] the Plaintiffs [sic] of their rights to freedom of speech, assembly and association ... ." *Id.* ¶ 206.

To confuse matters further, in his sixth cause of action, which asserts a claim under the Due Process Clause of the Fourteenth Amendment, plaintiff alleges that "Defendants sought to silence Plaintiff for voicing his opposition to the hiring and retention of Lisa Buckshaw ... ." *Id.* ¶ 218. As stated, though, plaintiff frames that allegation as part of a due process claim, not a First Amendment claim.

---

[14] Given the discomfort expressed by Brennan and Ms. White in their reports about those conversations, it seems highly doubtful that either of them would have agreed that those encounters inured to their and Geer's "mutual aid and protection."

It appears now, however, that plaintiff has abandoned a First Amendment claim based on anything other than his alleged opposition to Buckshaw's hiring.  This is curious but it is the only aspect of this claim discussed by plaintiff in his response to defendants' motion for summary judgment, *see* Dkt. #118 at 32-36, and by plaintiff's counsel at oral argument. Plaintiff's lack of clarity as to the basis for this claim is nevertheless noteworthy, insofar as it demonstrates that defendants have had to deal with a moving target in defending against the claim.

With respect to his alleged opposition to Buckshaw, Geer states in his affidavit (Dkt. #118-7) that he conducted "an intensive effort to oppose" Buckshaw's hiring as assistant principal in 2006 "with fellow teachers and administrators of the Gates Chili School District," because of concerns that he had about her.  *Id.* ¶ 83.  Specifically, he states that he was "aware of the allegations of illegal employment discrimination being brought against the administration of the Greece Central School District by several teachers in that District."  *Id.* ¶ 80.  Geer adds that "[a]s a political activist" he researched those allegations and "determined that hiring Lisa Buckshaw would not be in the best interests of the students, parents, community or the teachers" at Gates Chili.  *Id.* ¶ 82.  He states that in 2012, he also "began to lobby [his] colleagues and certain administrators, including Principal Iuppa, in an effort to prevent" Buckshaw from being selected to replace Iuppa upon Iuppa's retirement.  *Id.* ¶ 88.

Regarding Geer's statement about employment discrimination allegations, the Court notes that in January 2006, a lawsuit was filed by three individual plaintiffs against the Greece Central School District and three individual defendants, asserting claims of age discrimination. *See Krane v. Greece Central Sch. Dist.*, 06-cv-6021 (W.D.N.Y.), Dkt. #1.  At that time,

Buckshaw served as an assistant superintendent at Greece Central, with responsibility for curriculum development. She was not named or even mentioned in the complaint in that lawsuit (which was settled and dismissed in August 2006, *id.* Dkt. #7), and there is no evidence that Buckshaw was involved in the events giving rise to that lawsuit.

Geer's claim on this point is totally without merit. There is also no evidence, and Geer makes no allegation, that he ever made known his alleged opposition to Buckshaw's hiring as assistant principal in 2006 or her promotion to principal in 2012, to *anyone* other than colleagues at Gates Chili. He testified that he never raised his concerns about Buckshaw at a board meeting or in any public setting. (Dkt. #112-3 at 44.) He also testified that he never said anything about the matter to Buckshaw herself, although he alleges that on one occasion she overheard him "speaking very critically of [her] candidacy for the position of principal," and that Buckshaw "glared at [him] and walked away." (Dkt. #118-7 ¶ 90.) For her part, Buckshaw states that "[a]t no time prior to the commencement of this lawsuit was [she] aware that Mr. Geer opposed [her] hiring or [her] promotion." Buckshaw Aff. (Dkt. #112-6) ¶ 44.

The First Amendment, as applied to the states through the Fourteenth Amendment, protects all citizens' right to speak, free from governmental retaliation or punishment. "To establish First Amendment retaliation by a government actor, the plaintiff must demonstrate that '(1) his or her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him or her; and (3) there was a causal connection between this adverse action and the protected speech.'" *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 94 (2d Cir. 2020) (quoting *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018)). *Accord Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015).

This general principle is modified, however, when the plaintiff is a public employee.  To strike a balance between the employee's right to speak and the employer's interest in carrying out its functions effectively, when the plaintiff is a government employee, "the first element is satisfied only if the employee 'spoke as a private citizen and ... the speech at issue addressed a matter of public concern'–that is, the speech must be 'fairly considered as relating to any matter of political, social, or other concern to the community' and be of general interest or of legitimate news interest." *Agosto*, 982 F.3d at 95 (quoting *Montero*, 890 F.3d at 393, 399) (additional internal quotation marks omitted); *accord Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013).

There are, then, two threshold inquiries that the court must undertake on a First Amendment retaliation claim by a public employee:  first, whether the employee's speech related to a matter of public concern, and second, whether the plaintiff spoke "as a citizen" rather than as a public employee.  If the answer to either question is "no," then there is no First Amendment claim, and the court need not even consider the employer's reaction to the speech.  *Garcetti v. Ceballos*, 547 410, 417 (2006).

Although those inquiries are distinct from each other, they are related, since a public employee's speech about purely work-related matters will often fail on both counts.  A public employee's speech that "principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances–even if touching on a matter of general importance–does not qualify for First Amendment protection." *Montero*, 890 F.3d at 399-400 (internal quotation marks, citation, and alteration omitted).  *See also Gorman v. Rensselaer County*, 910 F.3d 40, 45 (2d Cir. 2018) ("The speech of a public employee is protected by the First Amendment when the employee speaks as a citizen on a

matter of public concern, rather than pursuant to his employment responsibilities") (citing *Garcetti*, 547 U.S. at 420-21); *Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir.2008) ("the airing of generally personal grievances is not brought within the protection of the First Amendment by the mere fact that one or two of [a public employee's] comments could be construed broadly to implicate matters of public concern"); *Brown v. N.Y. State Dep't of Corr. Servs.*, 583 F.Supp.2d 404, 412-13 (W.D.N.Y. 2008) ("A public employee's complaints to his supervisors about [his own treatment] typically do not meet the 'public concern' standard").

   "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record ... [and t]he inquiry into the protected status of speech is one of law, not fact." *Connick*, 461 U.S. at 147-48 n. 7.  *See also Ruotolo*, 514 F.3d at 189 (whether speech addresses a matter of public concern is a question of law for the court to decide).  In this analysis, the forum in which the plaintiff speaks will often be relevant to the determination whether the speech relates to a matter of public concern.  An internal complaint or grievance, for example, typically will "not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011).  In sum, the court must "evaluate whether the speech relates to any matter of political, social, or other concern to the community, and whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Hoyt v. Andreucci*, 433 F.3d 320, 330 (2d Cir.2006) (internal quotations marks and citations omitted).

   As stated, even if the employee's speech related to a matter of public concern, a First Amendment claim fails if the plaintiff spoke as an employee, rather than as a private citizen.  "If

the employee did not speak as a citizen, the speech is not protected by the First Amendment ... ."
*Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011).  "As a rule of thumb, activities required of
the employee as part of his employment duties are not performed 'as a citizen' if they are not
'the kind of activity engaged in by citizens who do not work for the government.'"  *Id.* (quoting
*Garcetti*, 547 U.S. at 423).  *See also Massaro v. New York City Dep't of Educ.*, 481 F.App'x 653,
655 (2d Cir. 2012) ("Public employees speak as employees–and not as citizens–when they 'make
statements pursuant to their official duties'") (quoting *Garcetti*, 547 U.S. at 421).  Whether the
plaintiff spoke as an employee or as a citizen is a question of law for the court to decide.
*Jackler*, 658 F.3d at 237, 238.

Applying these principles to the case at bar, it is evident that whatever Geer said about
Buckshaw's hiring as assistant principal and her promotion to principal were said in his capacity
as a public school teacher, not as a private citizen.  Moreover, the subject matter of his alleged
concerns about Buckshaw, while it may have mattered to Geer and possibly to other teachers at
Gates Chili, was not something likely to be of interest to the general public.

Notably, Geer's discussions about these matters never went beyond the school itself.  He
apparently spoke to some other teachers, and he states that his feelings about Buckshaw were
"well known" to Iuppa and other staff members.  By his own admission, Geer never raised his
concerns in any public setting, or communicated those concerns to members of the broader
public.  That suggests that Geer spoke as a teacher employed by Gates Chili, and weighs against
a finding that he spoke as a concerned citizen or in an attempt to bring this matter to the attention
of the public.  *See Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 290 (2d Cir. 2013) ("Nothing
in the complaint suggests that Fahs made a single public statement or ever intended to make such

a statement"); *Young Bolek v. City of Hillsboro,* No. 14-cv-740, 2016 WL 9455411, at *10

(D.Or. Nov. 14, 2016) ("There is no evidence that Bolek's emails concerning [the police chief,

who was plaintiff's supervisor] were made for the purpose of bringing to light any systemic

wrongdoing by the City that implicates a public concern for the community"); *Donofrio v. City*

*of New York*, No. 04 Civ. 3336, 2007 WL 9723328, at *6 (July 25, 2007) ("Donofrio's internal

protest about a single colleague that was allegedly hired without proper qualification was not

speech as a concerned citizen but rather as a disgruntled employee ... . Donofrio's gripe was with

one particular personnel decision as opposed to the general hiring practices of the NYPD").

Nor does the record support a finding that Geer's speech related to a matter of public

concern.  Assuming *arguendo* that the allegations about discriminatory practices in the Greece

school district were a matter of public concern, at least within that district, that is not what Geer

spoke about.[15]  While Geer has never been very clear precisely what concerned him so much

about Buckshaw, the fact is that she was not named in the Greece lawsuit, and there is no

evidence that she was involved in the events giving rise to that suit.  Her only connection to

those events is that she had worked in the Greece school district.  That fact was unlikely to have

sparked any public interest.

Moreover, the allegations in the Greece lawsuit, which involved age discrimination

against three teachers, were not of a sensational nature, or the sort of thing that would typically

be of interest to the public, at least outside the Greece school district.  The events in Greece did

---

[15] At Buckshaw's deposition, plaintiff's attorney referenced a *Washington Post* news article about the Greece matters, and the Court takes judicial notice that the *Post* did publish an article about the Greece lawsuit.  *See* "Four N.Y. Teachers Sue Walts, Allege Discrimination / Administration Accused of Age, Disability Bias," *Washington Post*, Jan. 15, 2006.  Far from indicating that the lawsuit was a matter of national interest, the story ran in the *Post*'s local news section because one of the defendants in the suit, Steven Walts, was at that time the superintendent of the Prince William County, Virginia schools.

not involve any harm or risk to students, or anything that might be expected to raise parents'

concerns about their children's welfare. *See Ruotolo*, 514 F.3d at 190 (speech that does not

reach beyond a "generalized public interest in the fair or proper treatment of public employees,"

is "not enough" to trigger First Amendment protection).

Finally, even crediting Geer's allegation that he opposed Buckshaw's hiring at Gates

Chili, there is no evidence that Buckshaw knew about that. She therefore could have had no

retaliatory animus against Geer based on that speech. *See Cellucci v. O'Leary*, No. 19-CV-2752,

2020 WL 977986, at *10 (S.D.N.Y. Feb. 28, 2020) ("a causal connection is absent in a

retaliation case if the decision-maker was unaware of the plaintiff's protected activity at the time

the adverse employment action was taken").

The only evidence that Buckshaw knew that Geer ever spoke to anyone about these

matters is Geer's allegation–which defendants dispute–that Buckshaw overheard him talking to

some colleagues about her prospective promotion to principal in 2012. By that time, any

concerns about Buckshaw's prior employment in Greece, which were unfounded in the first

place, would have evaporated. But also by that time, there had been several instances of Geer's

intemperate behavior, and at least one of those incidents (in April 2010, when Geer and a student

went to Buckshaw's office) involved Buckshaw.

Whatever concerns Geer had about Buckshaw in 2012, then, they were largely if not

entirely personal in nature. By his own admission, Geer never developed the sort of rapport with

Buckshaw that he had with Iuppa, and he would have liked to see someone with a more

"sympathetic ear" as Iuppa's replacement. When he voiced his feelings about her to other

teachers, then, Geer–whether he was just giving vent to those feelings, or trying to drum up

opposition to her promotion–was speaking about matters personal to him, not about any issues of public concern. *See Golodner v. Berliner*, 770 F.3d 196, 202 (2d Cir. 2014) (speaker's motive is a factor to consider in determining whether his speech addresses a matter of public concern); *Norton v. Breslin*, 565 F.App'x 31, 33-34 (2d Cir. 2014) ("while Norton's alleged complaints of forced overtime and under-staffing might implicate concerns for staff and patient safety, read in context, it is apparent that their primary focus is Norton's own work situation"); *Hoyt*, 433 F.3d at 330 ("[M]ere employee grievances do not qualify as matters of public concern").

Since Geer spoke as an employee about matters of private concern, that defeats his claim, and the Court need go no further. *See Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015). I note, however, that even if Geer could make out a facially valid First Amendment claim, there is no evidence that defendants took any action against him on account of his speech. Defendants had ample reason for terminating him, as found by the hearing officer and the state court. As explained in the discussion of his disability claims, it was Geer's persistent misbehavior that led to his discharge. To the extent that Geer's speech had anything to do with it, it was not his speech about Buckshaw, but his angry, hostile and sometimes threatening speech toward his coworkers and students.


## V. Negligent Retention/Supervision

While my conclusion that defendants are entitled to summary judgment on plaintiff's federal claims renders it unnecessary to reach the merits of his remaining state law claim for negligent retention and supervision, *see*, *e.g.*, *Compo v. River Real Estate Dev., LLC*, No. 18-cv-614, 2020 WL 6196138, at *8 (N.D.N.Y. Oct. 22, 2020), in the interest of judicial

economy and because this claim is factually related to plaintiff's federal claims, in the Court's discretion I will address it.  *See Whipple v. Reed Eye Associates*, 524 F.Supp.3d 76, 100 (W.D.N.Y. 2021) (noting that "[t]he Court has some discretion in this area").

Plaintiff alleges that the District and the Board were negligent with respect to their retention of Buckshaw as an employee, and in failing to adequately supervise her.  The basis for this claim is plaintiff's allegations that defendants knew or should have known about Buckshaw's "propensity" to engage in discriminatory behavior, and their knowledge of her allegedly wrongful actions toward Geer.

"To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show:  (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels."  *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159 (2d Dep't 1997)) (internal citations omitted).

As the discussion of plaintiff's disability and First Amendment claims makes clear, there is no sound basis for this claim.  There is not a shred of evidence that Buckshaw engaged in discriminatory or other unlawful acts while she worked at Greece, and for the reasons already stated she neither discriminated nor retaliated against Geer.  Defendants are therefore entitled to summary judgment on this claim as well.

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #112) is granted, plaintiff's cross-motion for summary judgment (Dkt. #113) is denied, and the complaint is dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
December 20, 2021.